E-FILED
Friday, 06 May, 2016  04:09:33 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION


NATHAN DOSS          )

                                                    )

                                                    )

                                                    )

                    PLAINTIFF,   )

)

VS.     )     CASE No.  15-cv- 2287-CSB-EIL

)

MARS, Inc., et al.     )          )

DEFENDANT  )

**FILED**

MAY – **6** 2016

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

<u>RESPONSE TO DEFENDANT MARS, INC. MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>

**NOW COMES** Plaintiff, NATHAN DOSS ("Plaintiff) pro se, and responds to DEFENDANT's Motion to Dismiss and for his good cause shown in support of her response Plaintiff states the following; THAT:

**FACTS**

1. Kenco Logistics is a 3rd party logistics company that manages warehouse and distribution centers for other companies.

2. Kenco Logistics stated to the Illinois Department of Human Rights in its Position Statement beginning on or about November 2014 in case number 2014CF0475, and subsequently again in case number 2014CF2858, 2014CF2992, 2014CF3057, 2014CF3161, 2015CF0310, 2015CF0811, 2015CF1145, 2015CF0342, 2015CF0990, 2015CF1315, 2015CA1464, 2014CF3162, 2015CF0003, 2015CF0006, 2015CF0515, 2015CF0516, 2051CF0699, 2015CA1054, 2015CA1590 and others that "Kenco is a third-party logistics company ("3PL") that operates and manages warehouses and order fulfillment operations for other companies."

3. "On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for Mars, Inc."

4. Kenco Logistics is a privately held company in the state of Tennessee

5. Kenco Logistics corporate structure, operating structure and legal structuring is not synonymous with any other company.

6. Kenco Logistics is part of the Kenco Group

7. Kenco Group current Chairman & CEO is Jane Kennedy Greene

8. Kenco Group President and COO David Caines

9. Kenco Logistics was hired to Manage the Mars, Inc. Manteno facility in Manteno, IL

10. Mars, Inc. is a privately held company in Virginia

11. Mars, Inc. paid Kenco Logistics a management fee to manage the Mars Manteno facility

12. Mars, Inc. passed thru their costs through Kenco Logistics with the exception of the lease, taxes, fire protection, insurance, rack expense/amortization, management fee, material handling fee were direct pays.

13. Specifically, Mars, Inc. passed thru Kenco Logistics the salaries of all the employees (temporary and part & full time employees), as well as, any invoices of the Mars Manteno facility.

14. This function performed was synonymous to that of the services provided by ADP, LLC.

15. Mars, Inc. managed Kenco Logistics

16. Specifically. Mars, Inc. would provide daily guidance to the Mars, Manteno facility.

a. On site Regional Distribution Manager; herein referred to as "RDM"

b. Morning meetings regarding the daily "Plan"

c. Fulfillment orders generated by Mars, Inc. through the WMS-SAP

    i. Through put of a Billion pounds or more annually of candy at the Mars Manteno facility

d. Mars, Inc. warehouse quality manual

e. Cross-functional collaboration between the Mars Manteno departments and Mars, Inc.

f. Employee incentives

17. Mars Manteno was a part of the network of Mars distribution centers.

18. Mars Manteno was the Midwest distribution center

a. Mars Manteno serviced twelve (12) Midwestern states and Canada

19. Mars Manteno was infrastructually similarly situated to the other four (4) distribution centers in the network in organization. For example, but not limited to a:

a. General Manager

b. Operations Manger

c. Accounting/Human Resources

d. And the like….

20. Organizationally the Mars Manteno General Manager answered to and conferred with the onsite RDM of Mars, Inc., as a matter of the course of ordinary business operations.

21. *Black's Law Dictionary* defines "employee" as "a person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.

22. Mars, Inc. provided and stipulated such terms and conditions of employment, to Kenco Logistics, as well as, compliance; specifically with the Mandates of Mars outlined in the **Mars US Warehouse Quality Manual** and public policy, including but not limited to FSMA (Food safety and Modernization Act, 2001 Bioterrorism Act, CFR Title 21, and any other applicable public policy, just as it would with any employee and as it had done with the previous Management Company at the Mars Manteno Facility and its various other warehouse.

23. Mars, Inc. required Kenco Logistics and Kenco Logistics agreed to be compliant with Public Policy, as it relates to the codified laws of the land, just as it would with any employee.

24. Specifically, Mars, Inc. provided Kenco Logistics with company policies, procedures, manuals and the like, just as it would with any employee.  In addition, Mars, Inc. provided the necessary tools to perform the assigned job functions, such as but not limited to: Leasing the facility, the equipment (warehouse and office), the computers, the software, as well as, the maintenance, upkeep and repairs of such, just as it would for any employee.

25. Specifically, Mars, Inc. provided to Kenco Logistics, just as it had its former management company on a regular and ongoing basis, a comprehensive standard to safeguard the Quality and Food Safety of its products in the outbound pipeline. The document was developed in conjunction with Global Quality and Food Safety Requirements.

26. Specifically, Mars, Inc. set the performance management standards and goals for Kenco Logistics, just as it would with any employee.

27. Kenco Logistics because of its multifunctional and multilayers of management types can be coined as a "Super Manager."

28. Specifically, Mars, Inc. provided it's "Super Manager" Kenco Logistics with ongoing guidance, support and management continually, just as it would with any other employee.

29. Specifically, Mars, Inc. provided this support, guidance and management, just as it would with any employee, to its "Super Manager" Kenco logistics and the Mars Manteno Facility, by way of an in-house Regional Distribution Manager (RDM).

30. Kenco Logistics, it's "Super Manager" just as any employee would, on an ongoing regular and regimented basis conferred with, Mars, Inc. for directives and goals, while conforming to these directives, and reporting the results of such to Mars, Inc.

31. Just as any manager would, Kenco Logistics a type of "Super Manager" dovetailed their management styles to synergize the mandates of it employer, Mars, Inc. and public policy to meet the performance management goals set by Mars, Inc.

32. Pointedly, Public policy drives industry standards that drive company policy. Specifically, in this case the Food, Drug and Cosmetic Act (FD&C Act), Food Safety and Modernization Act (FSMA, the 2001 Bioterrorism Act and other Acts, as well as, The World Health Organization (WHO), Codex Alimentarius, FAO and other organizations, shape and form the various recognized Global Food Safety Initiative (GFSI) benchmarks; which include but are not limited to: FSSC 2200, ISO2200, BRC, IFS, SQF and other food safety standards.

33. Specifically, Kenco Logistics was assigned the task of implementing a written Quality Management System based upon the current non-documented procedures and protocols being performed at the Mars Manteno facility. This standard was based upon ISO, the International Standard of Organization.

34. Kenco Logistics Quality Management System is based on an ISO, the International Standard of Organization; the specific ISO standard is 9001:2008.

35. Specifically, Kenco Logistics implemented a written Quality Management System at the Mars Manteno Facility.

36. Mars, Inc. and Kenco Logistics are both certified to some Global Food Safety Initiative standard and or benchmark.

37. Pointedly, yearly external audits are required to remain compliant to the Quality Management System, along with internal audits.

38. Furthermore, the Federal Government under the 2001 Bioterrorism Act and the 2011 Food Safety Modernization Act, require all august body participants along the food supply chain to be complaint; Essentially from farm to fork.

39. Kenco Logistics publicly purports to "ensure all requirements are documented according to the ISO-9001:2008 structure and are incorporated into the sites' standard operating procedures. Through regular internal audits and program development, Kenco's quality team provides support and industry expertise in FDA, OSHA, EPA, DEA, DOT, and numerous other compliance agencies."

40. Specifically, the system implemented at the Mars Manteno facility was to be a standardization of all policies, procedures, mandates and the like. This included, but was not limited to job analysis, job descriptions and the corresponding operating procedures for each job. These and all-encompassing documents are authored and vetted.

41. Pointedly, all Quality Management systems, including but not limited to this Mars Manteno Quality Management System, mandate that all documents are to be catalogued, controlled, maintained, and stored amongst other requirements.

42. Pointedly, Kenco Logistics developed an Appendix A for the Mars Manteno Facility that

catalogued the corresponding standardized documents for the Mars Manteno Facility. This included but was not limited to Job descriptions, Standard Operating Procedures, policies, and forms.

43. Pointedly, Kenco Logistics also maintained an Appendix F, a higher matrix of Appendix A, top tier documents, that catalogued the corresponding standardized documents for the Kenco Logistics as a whole, inclusive of the Manteno Facility, as well as, other managed facilities. This included but was not limited to Job functions by titles, Standard Operating Procedures, policies, forms and the like.

44. Pointedly the documents itemized in Appendix A for the site super ruled those documents in Appendix F because they were customized to the specific employer's and site requirements.

45. To ensure proper dissemination and training, each policy and or procedure are to be signed off by each employee and a record retained of such.

46. Pointedly, no deviation from any policy and procedure is to occur, without following the procedure of the exception procedure and an approval of such on any level.

47. President, David Caines, of the Kenco Group referred to the employees of the Mars Manteno site specifically as Mars, Inc. employees.

48. The "Super Manager's" role was to manage and enforce the directives and mandates of Mars, Inc. at the Mars Manteno facility that was owned, leased and operated by Mars, Inc. since the Mars, Inc. Manteno inception in 1999.

49. The means test for an employee is below based upon the Common-law test, the Economic realities test, and the Hybrid test and the results.

**Determination test whether a worker is an employee**

| Test | Description | Laws under which test has been applied by courts |
|---|---|---|
| Common-law test (used by Internal Revenue Service (IRS)) | Employment relationship exists if employer has right to control work process, as determined by evaluating totality of the circumstances and specific factors | Federal Insurance Contributions Act<br><br>Federal Unemployment Tax Act<br><br>Income tax withholding<br><br>Employment Retirement and Income Security Act<br><br>National Labor Relations Act<br><br>Immigration Reform and Control Act (IRS test)<br><br>Fair Labor Standards Act |
| Economic realities test | Employment relationship exists if individual is economically dependent on a business for continued employment | Title VII<br><br>Age Discrimination in Employment Act<br><br>Americans with Disabilities Act<br><br>Family and Medical Leave Act (likely to apply) |
| Hybrid test | Employment relationship is evaluated under both common-law and economic reality test factors, with a focus on who has the right to control the means and manner of a worker's performance | Title VII<br><br>Age Discrimination in Employment Act<br><br>Americans with Disabilities Act |

### Worker's status under the common-law test

| Factor | Worker is an employee if— | Entity |
|---|---|---|
| Right to control | Employer controls details of the work | Mars, Inc. controls details of the work |
| Type of business | Worker is not engaged in business or occupation distinct from employer's | Kenco Logistics, its "super Manger" operates in business that is not distinct from its employer's business |
| Supervision | Employer supervises worker | Day to day workflow dictated & overseen by Mars, Inc. |
| Skill level | Skill level need not be high or unique | Kenco Logistics, its "Super Manager" did not perform any special task or have a special skill set unique, or substantial training than the current employees and departments of the Mars Manteno facility. |
| Tools and materials | Employer provides instrumentalities, tools, and location of workplace | Mars, Inc. provided the instrumentalities and tools of workplace and work site to its "Super Manager" and the other employee's. Mars Manteno is part of a network of Mars, Inc. Warehouses. |
| Continuing relationship | Worker is employed for extended, continuous period | Kenco Logistics, its "Super Manager" was employed for an extended period of timer |
| Method of payment | Worker is paid by the hour, or other computation based on time worked is used to determine pay | Kenco Logistics, its "Super Manager" was paid a management fee to manage the Mars, Inc. Manteno facility. |
| Integration | Work is part of employer's regular business | Kenco Logistics, the "Super Manager" work is part of employer's regular business |
| Intent | Employer and worker intend to create an employer-employee relationship | Employer and worker intend to create an employer-employee relationship when it entered into an agreement for Kenco Logistics to manage its mars Manteno facility. |
| Employment by more than one firm | Worker provides services only to one employer | Kenco Logistics, the "Super Manager" line of business is to provide management services. |

**Factors** used to determine a worker's status under the economic realities test

| Factor | Worker is an employee if— | Entity |
|---|---|---|
| Integration | Worker provides services that are a part of the employer's regular business | Kenco Logistics, the "Super Manager" line of business is to provide management services; therefore, no work was provided outside the regular business of the employer. In addition, no function executed by the "Super Manger" was not being performed at the Mars Manteno facility, including but not limited to General Management, HR, Accounting and the like.

Kenco Logistics, the "Super Manager" line of business is to provide |

| | | |
|---|---|---|
| Investment in facilities | Worker has no investment in the work facilities and equipment | management services and has no interest in the Mars, Manteno facility. Both Kenco Logistics and Mars, Inc. have indicated that they are independent legal entities of one another. |
| Right to control | Management retains a certain type and degree of control over the work | Mars, Inc. at its sole discretion directed the day to day work flow through The Warehouse Management system (WMS)-SAP ERP. This system provides the structure to process all "goods" movements and in managing stocks in the warehouse complex. The system supports scheduled and efficient processing of all logistics processes within the Mars Manteno warehouse. |
| | | The WMS is fully integrated into the SAP environment. That allow business processes that are triggered in other application components, lead to the physical goods movement in the warehouse. Organization, control, and monitoring of goods movements are tracked within the WMS. |
| Risk | Worker does not have the opportunity to make a profit or incur a loss | Kenco Logistics, the "Super Manager" was paid a management fee and was not entitled to any profit of Mars, Inc., as they are not a stakeholder in Mars, Inc. Both entities have stated that they are separate legal entities. |
| Skill | Work does not require any special or unique skills or judgment | Kenco Logistics, the "Super Manager" did not perform any duties or tasks that were not or had not been performed at the facility with the exception of the scribing the written procedures already being performed at the Mars Manteo facility. |
| Continuing relationship | Worker has a permanent or extended relationship with the business | Kenco Logistics, the "Super Manager" had an ongoing and working relationship with Mars, Inc.; executing its mandates. |

50. Title VII provides that it is "an unlawful employment practice for an employer to fail or refuse to hire or discharge any person or otherwise … to discriminate against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, age or natural origin."

51. Title VII is at bottom an enterprise liability scheme. It is structured to hold employing entities—not individuals—accountable for discrimination within the organization.

52. The Mars-Manteno facility, since its inception in 1999, has been a fully functional facility comprised of a General Manager, Operations Manager, Accounting and Human Resource Department, supervisors, and workers.

53. Kenco, Mars, Inc., "Super Manager" provided back office support to the accounting and human resource department, as well as, the implantation of Kenco management styles, including but not limited to: Kenco Quality Management System (KQMS), an ISO 9001:2008 based system, Operational Excellence and Continuous Improvement based upon Lean and Six Sigma principles.

54. The specific back office support provided by Kenco entailed pass thru on the invoices/bills of the Mars Manteno facility to Mars, Inc. after they were receipted, reconciled and the like at the Mars Manteno Facility Accounting Department. In addition to the invoice pass thru to Mars, Inc., Kenco also passed thru the Mars Manteno payroll by issuing the payroll checks, after the payroll had been processed, verified and submitted by the Mars Manteno Accounting Department for the five (5) different payrolls that comprised the Mars Manteno Facility to Kenco's payroll department.

55. The additional specific back office support provided by Kenco was the recruitment and hiring of salaried personnel for the Mars Manteno facility, as well as, other Human Resource support, such as but not limited to: training, benefit administration, and the like.

56. The KQMS style was to standardize the facility to bring compliance to 21CFR110, Food Safety and Modernization Act, 2002 Bioterrorism Act, as well as, any other applicable Global Food Safety Initiative (**GFSI**) benchmarked schemes; in addition to, streamlining

business process, increase efficiency, profitability and accountability.

57. The claims of disparate and disparate treatment and impact were reported to the site Human Resource Personnel, as well as, the Employee Assistance Line-email, phone and fax, Paula Hise, Vice President of Operations, Tammi Fowler, Senior Employee Relations Manager Kenco Corporate, Dan Dey- Corporate Risk Manager, Kelvin Walsh, former General Manager, David Jabaley, Director of Operations, by phone, email, and in-person on numerous occasions.

58. Specifically these claims were made from December 2013 through December 2014

59. Kenco, the "Super Manager" did nothing to investigate, remediate, or mitigate these claims despite having sufficient knowledge of such claims.

60. DOSS was promoted from a Warehouse Associate to a Shift Lead on or about December 9, 2013.

61. Immediately upon DOSS's promotion, he was harassed and subjected to unequal terms and conditions of employment than other Shift Leads, when Walsh failed to pay him the prevailing wage of a Shift Lead upon promotion.

62. This subjugation began to create an animus and hostile work environment for DOSS.

63. DOSS questioned Walsh about the pay disparity and Walsh informed him that do to budgetary reasons, defendant KENCO was not able to give him the prevailing wage, but would administer prorated increases in pay over a period of time.

64. On or about December 16, 2013, unbeknownst to DOSS, KENCO through Tammi Fowler, its then Corporate Senior HR Employee Relations Manager approved and endorsed such actions of Walsh to prorate plaintiff's wages.

65. In late February 2014, DOSS was initially asked by Manzello to go for external training for the implementation of a new warehouse management system called "Red Prairie."

66. "Red Prairie" was a MARS, Inc. MARS Manteno system wide warehouse management system change.

67. MARS, Inc. required external training for the "Red Prairie" conversion, integration, and roll out.

68. In the beginning of March 2014, DOSS complained to Walsh, Manzello, and the Manteno site Human Resource personnel that he was being subjected to unequal terms and conditions of employment by not being paid the prevailing rate of a Shift Lead, as similarly situated, non-black and female Shift Leads.

69. Shortly after having complained to Walsh, Manzello and the Manteno site Human Resources personnel of having been subjected to such unequal terms and condition of employment, DOSS was told by Manzello that he was not going for the external training on the new warehouse management system.

70. No reason was articulated for not giving plaintiff the training on the new system, despite it being a prerequisite to the system change.

71. DOSS was effectively denied training for the mandated system upgrade in March of 2014.

72. DOSS complained to Walsh, Manzello and the Manteno Human Resource personnel about

the lack of training, along with the other disparities that he had been subjected to.

73. KENCO, MARS, Inc., "Super Manager" sent all the non-black leads for external training on the Red Prairie warehouse management system in March of 2014.

74. Immediately after DOSS complained of not being trained for the Red Prairie warehouse management system, he began being subjected to continued harassment by Walsh, Manzello and Valerie Lillie

75. At all relevant times, Kelvin Walsh, Mike Manzello and Valerie Lillie were acting as agents, servants and/or employees of Defendants MARS, Inc. and KENCO.

76. KENCO and MARS, Inc. are liable for the acts and omissions of these individuals pursuant to the principals of ratification, respondeat superior and actual and/or implied agency.

77. Furthermore, upon information and belief Kelvin Walsh, David Jabaley prevented Kenco from taking any remedial action, as it relates to these claims through some contrived scheme to continue to subjugate Doss to unequal terms and conditions of employment, harassment, discrimination, a hostile work environment and retaliation, as well as, conspire against DOSS' federally protected rights.

78. In May of 2014, Kelvin Walsh, a MARS, Inc. employee incited the already hostile and animus work environment by publicly humiliating DOSS after having to return him to work after forcing him to take a drug test under the pretext that he had an accident on equipment while working. Contrary to the reason given him for allegedly smelling like "weed".

79. The initial reasonable suspicious drug testing confrontation was done in front of the entire office workforce including but not limited to the MARS, Inc. Regional District Manager, HR Personnel, other office workers and bystanders.

80. Pointedly Kelvin Walsh continued to foster an animus and hostile work environment by using every opportunity to subjugate DOSS to unequal terms and conditions of employment, pay disparity, ostracization, malicious and cruel comments and the shear refusal to not treat DOSS disparately or disparagingly.

81. MARS, Inc., "Super Manager" Kenco told DOSS that they would investigate the claims.

82. MARS, Inc., "Super Manager" Kenco misrepresented to Doss that they would investigate these claims.

83. The "Super Manager" Kenco did nothing to investigate, remediate, or mitigate the claims of disparate and disparaging treatment.

84. Pointedly MARS, Inc. had a business need for Leads, as the "Super Manager" Kenco actively and aggressively began internally and externally recruiting for such to meet the MARS Manteno business needs.

85. In tandem, MARS, Inc. would have been apprised of this need, as MARS, Inc. drove the work flow, work assignments and provided directives periodically throughout the day.

86. MARS, Inc. had an onsite Regional District Manager that participated and facilitated those day to day work activities for the Mars Manteno facility.

87. Several Leads were hired and/or promoted while DOSS was on prorated pay.

88. The Leads the "Super Manager" hired were non-African American, non-black, and female.

89. To exacerbate the kindling hostile and animus work environment, the same Leads the

"Super Manager" hired were non-African American, non-black, and female, were paid the
prevailing rate without proration.

90.  One of the same Leads the "Super Manager" hired was non-African American, non-black,
female, was given a premium shift than DOSS.

91.  The same Lead the "Super Manager" hired was non-African American, non-black, female,
were given more overtime than DOSS.

92.  The same Lead the "Super Manager" hired were non-African American, non-black, female,
was given forty (40) hour weeks when DOSS a more tenured employee shift was routinely
cancelled; effectively denying him a full forty (40) hour work week.

93.  The same Lead the "Super Manager" hired was non-African American, non-black, female
was not qualified for the position, as she could not drive a fork-lift and was not certified to
do such.

94.  DOSS was also subjugated to harsher discipline, scrutiny, economic sanctions of
suspensions, public humiliation, drug and diabetic testing and numerous other malicious
acts.

95.  In addition, those who were associated with DOSS and opposed such disparate and
disparaging treatment were also subjugated to such treatment, including but not limited to
suspensions, harsher work assignments, demotions and the like.  For example, but not
limited to: Scott Marksteiner and Anastasia Sandness.

96.  DOSS made numerous complaints about the pay disparity, the unequal terms and
conditions of employment, the lack of work, scheduling and the like to site HR Personnel
and management, including the GM, as well as, the "Super Manager's" corporate HR
Personnel and Director of Operations.

97. Such pervasive behaviour gave rise to other employees engaging in equally pervasive or overt disparate and disparaging treatment and impact to African Americans and those who opposed such.

98. Seemingly, KENCO did nothing to investigate, mitigate, or address the issue that Kelvin Walsh, Tammi Fowler, Mike Manzello, David Jabaley and Mario Lopez intentionally and willfully did not follow company policy as it relates, to the unequal terms and conditions of employment, unequal pay and other matters.

99. Pointedly, it is unreasonable to believe that MARS, Inc. had no foreknowledge of these matters, as the Regional District Manger's office area was in close proximity of the MARS, Inc. MARS Manteno General Manager's office.

100. Pointedly, it is unreasonable to believe that MARS, Inc. had no foreknowledge of these matters, as this pervasive disparate and disparaging treatment was the MARS, Inc. MARS Manteno culture.

101. Whether in part intentionally or unintentionally MARS, Inc. and Kenco conspired to continue to subjugate DOSS to disparate and disparaging treatment and impact; this conduct that constitutes individual liability as well.

102. Both the MARS, Inc. and KENCO retaliated against him by failing to take corrective action in response to his complaints; in effect condoning the discrimination against him by his supervisor for which liability may be imputed to his employer.

103. Plaintiff alleges that both entities bear responsibility as his joint employers because various supervisory responsibilities and policy decisions regarding Plaintiff's employment were divided between KENCO and MARS, Inc.

104. Plaintiff finally contends that these failures were effectuated recklessly by both KENCO

and MARS, Inc.

105.  Furthermore, for C-Suite (Corporate Officers) to knowingly and purposely violate company policy by not investigating the claims of disparate and disparaging treatment and impact as mandated by company policy, as well as, violating public policy is truly reckless, unlawful and unconscionable at best.

## REBUTALL

On the merit and within the context of Kenco Logistics, the "Super Manager's", own definition, stance or description of the Mars Manteno employee's employment relationship to Mars, Inc., as being an employer-employee relationship; thereby, ultimately defining the "Super Manager's" relationship to Mars, Inc., as an employee, as well as, well defining the role between the "Super Manager" and the Mars Manteno employees.

Contrarily, if MARS, Inc. continues to perpetrate this theory of defense, based upon the fact that they are a privately held company, separate distinct and unique legal entity and undisputedly, in this case, Kenco Logistics is its own separate distinct and unique legal entity, who engaged in an employment contract/agreement to manage the Mars Manteno facility; whereby, Mars, Inc. drove and governed the relationship debunks the theory that MARS, Inc. should not be held liable.

MARS, Inc. sufficiently met the requirements under the common law and economic realities test to be the employer of Kenco Logistics.

If the two entities are separate and distinct, and both fostered, condoned, encouraged, and perpetuated disparate and disparaging impact and treatment to African Americans and those who opposed such treatment and impact; both should be liable.

Or contrarily, if MARS, Inc. failed to do address, mitigate, or dissuade such behavior liability is created as well.

Furthermore, it is unreasonable and unrealistic to believe that the Mars Manteno, the Mid-West distribution center for MARS, Inc., North America Chocolate, for twelve (12) states, the largest distribution center in the network, with a throughput of a "Billion Pounds" of candy annually, with a specific operating budget of over twenty ($20) million for the Mars Manteno facility to be a "quasi" or hands off employer that had no control over or the knowledge of the behavior of its "Super Manger."

Pointedly, according to the then RDM, "*As the Regional Distribution Manager for the largest DC in the network, my role was to optimize customer satisfaction and consistently deliver continuous improvement across several KPI's.* He goes on to say: "*Effectively controlled $300 million of finished goods inventory to provide an efficient, flexible and responsive supply chain through direction of factory outbound logistics operations and third party service providers.*

   a. Finished Goods inventory is defined as, "Finished Goods Inventory=Beginning Finished Goods Inventory + Cost of Goods Manufactured-Cost of Goods Sold." In other words, your finished goods is the amount of goods you have at the beginning of the period, plus any added manufactured goods throughout the period, minus the manufacturing costs of any goods sold in that period.
   b. The sales price of the finished goods inventory is different from the value of the finished goods inventory.
   c. Typically according to industry standards the markup on goods sold is roughly two (2) times.
   d. Consequently, the net value of the finished goods sold is significantly higher than the finished goods inventory
   e. The retail value of the warehouse goods stored was a upward of one (1) billion dollars (1B).

Furthermore, it is insulting, unreasonable, disingenuous, and sublime to ridiculous for MARS, Inc. to proofer such a "quasi" and aloof business relationship with its "Super Manager," to the courts in attempt to evade culpability, considering the voluminous throughput and profitability of the largest Distribution Center in its North American Network of almost a Billion Dollars a year.

This is not a reasonable, efficacious, or sound business practice, concept or norm.

Considering that all of the charges filed against Kenco Logistics, the "Super Manager", as well as, some of the charges naming MARS, Inc., a number in excess of thirty (30) charges were served to the Mars, Inc. Manteno facility, it is unreasonable and unrealistic to believe that Mars, Inc. or its other agents, such as but not limited to the in-house Regional Distribution Manager had no foreknowledge of the numerous charges filed against the facility and its management, as well as, the racially charged, animus, and hostile environment at the facility.

Moreover, if for whatever reason these charges and animus work environment eluded Mars, Inc. in-house Regional Distribution Manager, it was the "Super Manager's" fiduciary obligation to report to its employer the impending litigious matters.

Upon information and belief, Mars, Inc. did nothing to discourage, dissuade, or quash the unlawful and unconscionable behaviors of the "Super Manager" Kenco Logistics; thereby aiding and abetting Kenco Logistics in its numerous contrived schemes to subjugate employees who complained or opposed such treatment to economic sanctions, harsher scrutiny and discipline, unequal terms and conditions of employment, pay disparity, lack of opportunities, training, adverse employment decisions and job opportunity and advancement.

In addition, the "Super Manager" Kenco Logistics knowingly, intentionally and willfully continues to evade justice and culpability by disingenuously and deceitfully presenting to regulatory agencies fraudulent, false, and misleading information and doctrine by verified response, testimony, policies and subordinate documentation is a willful, woeful, egregious and blatant elaborate contrived scheme to manipulate, skew, and influence and impede the course of justice.

However, what is written is according to the majority: The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race.

To uphold this sentiment, we (individually and collectively) must cross-functionally and vehemently work together to eradicated racism, disparate and disparaging treatment and impact, pay disparities, unequal terms and conditions of employment, abuse of authority and power, lack of opportunities and training, disproportionate administering of harsher scrutiny and discipline, as well as, the misapplication and interpretations of the laws.

**To begin our journey, we pray that this court deny Defendant's MARS, Inc. Motion to dismiss.**

Kenco, MARS, Inc. "Super Manager" has not met the burden of proof even under its own theory of defense, as it relates to an employer employee relationship. At the onset of this business relationship with Mars, Inc., David Caines, President of The Kenco Group affirmed that the employees of the Mars Manteno Facility were Mars employees.  In addition to that, the Defendant consistently until the end of their contractual relationship continued to operate and posture in this manner, by being a pass thru company for Mars, Inc.; whereby Mars, Inc. bore all of the operating costs for the employees and the Manteno facility.  Defendant, Kenco, acted more in a management capacity, specifically a "Super Manger" for Mars, Inc. and was specifically paid a management fee for such.

With that being said, according to Defendant's own interpretation of the employment relationships, some of the employees who committed the egregious and reprehensible acts were not there employees.  In addition, other participants and or agitators were also not employees of Kenco Logistics, but MARS, Inc.

Moreover, Kenco did nothing to quash, ameliorate, or discourage these behaviors and precedents. Matter of fact, in one instance, MARS, Inc., "Super Manager" Kenco's Vice President publicly encouraged such behavior, by stating that Kelvin Walsh, a perpetrator of numerous disparate and disparaging acts, was a valued employee and friend.  Walsh was named in a minimum of 10 charges filed at the Illinois Department of Human Rights, as well as, others being named in multiple charges as well.

Kenco, including but not limited to its Corporate Officer, directors, and the like knowingly and willingly aided and abetted these same persons, Mars, Inc. employees, and conspired with them and others to avoid culpability, obstruct and impede justice, as well as, to continue violate the federally protected rights of individuals.

Pointedly, Mars, Inc. did nothing as well.

Pointedly at the onset of these numerous complaints being made, it would have been prudent and

wise for MARS, Inc. to inquire or require a disposition of the matters at hand, as well as, identifying the root cause or the culminating events that preempted the complainants being waged.

Any reasonable and conscience person would have thought to do so and benchmark it against the various parties.

MARS, Inc. "Super Manager" Kenco has a known pattern, practice and admitted history to the Virginia Eastern Court in case number 3:10-cv-00668, of disparate, disparaging treatment and impact, as well as, adverse employment decision making towards African Americans, with some of the same Attorneys of fact making less than genuine representation to various regulators during the process of this administrative remedy.

For the sake of further entertaining Defendant's theory, Kenco is a privately held company out of Tennessee. Mars, Inc. is also a privately held company. Mars, Inc. and Kenco Logistics have no legal affiliations, ownership, interests or causal connections outside their extinct and now defunct business relationship.

Both entities represented their distinct and independent legal entities to the court.

If Mars, Inc. contention is true that they are not liable and have no affiliation with The Kenco Group, specifically Kenco Logistics, then out of their business relationship and the actions of Kenco Logistics a vicarious liability was created. Pointedly and more specifically, because Mars, Inc. failed to censor, sanction, discourage their 3rd party manager from such hostile and pervasive behavior; effectively two (2) companies conspired together to avoid culpability and continue to violate DOSS protected rights.

Consequently, the conspiracy, willful interference and aiding and abetting are some of the key the elements that comprised the execution of the retaliatory actions, the obstruction and impediments to justice.

As a side note, the law is very pointed about corporate criminal liability; therefore, since

corporations cannot be punished as individual can, coupled with the fact, that the individuals perpetrated the act; individual defendant's should not be dismissed.

Pointedly, DOSS had no knowledge that the persons identified committing the unlawful acts would not be held accountable and needed to be named individually, as well as, to muddier extent of the convoluted business relationship between MARS, Inc. and Kenco, the "Super Manager." DOSS followed the information provided by the Illinois Department of Human Rights and had no other information to benchmark it against to ensure that all respondents were served accordingly.

Pointedly, DOSS named MARS, Inc. as a respondent, but the Illinois Department of Human Rights failed to serve respondent.

Furthermore, Kenco Logistics held themselves out and postured themselves to be the employer, when in fact they were not by their own volition in their numerous position statements to the Illinois Department of Human Rights were mere managers.

**WHEREFORE,** Plaintiff requests that this Honorable Court rule in his favor and deny DEFENDANT's Motion.

Respectfully submitted,
**NATHAN DOSS**

By:

Pro Se

NATHAN DOSS

1124 Abbott Lane

University Park, IL 60484

708.543.0536

Date

## CERTIFICATE OF SERVICE

Please take notice that on May 6, 2016 I, Nathan Doss, hereby, certify that I did file a Response TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT with the Central District of Illinois Urbana Division in the foregoing matter of Case No. 15-cv- 2287-CSB-EIL and have served the persons identified on the docket's service list via regular mail.

Pro Se

NATHAN DOSS

1124 Abbott Lane

University Park, IL 60484

708.543.0536

**FILED**

MAY - 6 2016

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

Kimberly J. Overbaugh

Thomas R. Davies

Harmon & Davies, P.C.

2306 Columbia Ave.

Lancaster, PA 17603

717.291.2236