IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

NATHAN DOSS )
)
)
)
PLAINTIFF, )
)
VS. )     CASE No.  15-cv- 2287-CSB-EIL
)
MARS, Inc., et al. )
)
DEFENDANT )

<u>RESPONSE TO DEFENDANT KENCO'S MOTION TO DISMISS PLAINTIFF'S
COMPLAINT- COUNTS I-IV</u>

**NOW COMES** Plaintiff, NATHAN DOSS ("Plaintiff) pro se, and responds to
DEFENDANT's Motion to Dismiss and for his good cause shown in support of her response Plaintiff
states the following; THAT:

### FACTS

1. Kenco Logistics is a 3rd party logistics company that manages warehouse and distribution
   centers for other companies.

2. Kenco Logistics stated to the Illinois Department of Human Rights in its Position
   Statement beginning on or about November 2014 in case number 2014CF0475, and
   subsequently again in case number 2014CF2858, 2014CF2992, 2014CF3057,
   2014CF3161, 2015CF0310, 2015CF0811, 2015CF1145, 2015CF0342, 2015CF0990,
   2015CF1315, 2015CA1464, 2014CF3162, 2015CF0003, 2015CF0006, 2015CF0515,
   2015CF0516, 2051CF0699, 2015CA1054, 2015CA1590 and others that "Kenco is a
   third-party logistics company ("3PL") that operates and manages warehouses and order
   fulfillment operations for other companies."

3. "On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for
   Mars, Inc."

4. Kenco Logistics is a privately held company in the state of Tennessee

5. Kenco Logistics corporate structure, operating structure and legal structuring is not synonymous with any other company.

6. Kenco Logistics is part of the Kenco Group

7. Kenco Group current Chairman & CEO is Jane Kennedy Greene

8. Kenco Group President and COO David Caines

9. Kenco Logistics was hired to Manage the Mars, Inc. Manteno facility in Manteno, IL

10. Mars, Inc. is a privately held company in Virginia

11. Mars, Inc. paid Kenco Logistics a management fee to manage the Mars Manteno facility

12. Mars, Inc. passed thru their costs through Kenco Logistics with the exception of the lease, taxes, fire protection, insurance, rack expense/amortization, management fee, material handling fee were direct pays.

13. Specifically, Mars, Inc. passed thru Kenco Logistics the salaries of all the employees (temporary and part & full time employees), as well as, any invoices of the Mars Manteno facility.

14. This function performed was synonymous to that of the services provided by ADP, LLC.

15. Mars, Inc. managed Kenco Logistics

16. Specifically. Mars, Inc. would provide daily guidance to the Mars, Manteno facility.
    a. On site Regional Distribution Manager; herein referred to as "RDM"
    b. Morning meetings regarding the daily "Plan"
    c. Fulfillment orders generated by Mars, Inc. through the WMS-SAP
        i. Through put of a Billion pounds or more annually of candy at the Mars Manteno facility
    d. Mars, Inc. warehouse quality manual

e. Cross-functional collaboration between the Mars Manteno departments and Mars, Inc.

f. Employee incentives

17. *Mars Manteno was a part of the network of Mars distribution centers.*

18. Mars Manteno was the Midwest distribution center

    a. Mars Manteno serviced twelve (12) Midwestern states and Canada

19. Mars Manteno was infrastructually similarly situated to the other four (4) distribution centers in the network in organization.  For example, but not limited to a:

    a. General Manager

    b. Operations Manger

    c. Accounting/Human Resources

    d. And the like….

20. Organizationally the Mars Manteno General Manager answered to and conferred with the onsite RDM of Mars, Inc., as a matter of the course of ordinary business operations.

21. *Black's Law Dictionary* defines "employee" as "a person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.

22. Mars, Inc. provided and stipulated such terms and conditions of employment, to Kenco Logistics, as well as, compliance; specifically with the Mandates of Mars outlined in the **Mars US Warehouse Quality Manual** and public policy, including but not limited to FSMA (Food safety and Modernization Act, 2001 Bioterrorism Act, CFR Title 21, and any other applicable public policy, just as it would with any employee and as it had done with the previous Management Company at the Mars Manteno Facility and its various other warehouse.

23. Mars, Inc. required Kenco Logistics and Kenco Logistics agreed to be compliant with Public Policy, as it relates to the codified laws of the land, just as it would with any employee.

24. Specifically, Mars, Inc. provided Kenco Logistics with company policies, procedures, manuals and the like, just as it would with any employee.  In addition, Mars, Inc. provided the necessary tools to perform the assigned job functions, such as but not limited to: Leasing the facility, the equipment (warehouse and office), the computers, the software, as well as, the maintenance, upkeep and repairs of such, just as it would for any employee.

25. Specifically, Mars, Inc. provided to Kenco Logistics, just as it had its former management company on a regular and ongoing basis, a comprehensive standard to safeguard the Quality and Food Safety of its products in the outbound pipeline. The document was developed in conjunction with Global Quality and Food Safety Requirements.

26. Specifically, Mars, Inc. set the performance management standards and goals for Kenco Logistics, just as it would with any employee.

27. Kenco Logistics because of its multifunctional and multilayers of management types can be coined as a "Super Manager."

28. Specifically, Mars, Inc. provided it's "Super Manager" Kenco Logistics with ongoing guidance, support and management continually, just as it would with any other employee.

29. Specifically, Mars, Inc. provided this support, guidance and management, just as it would with any employee, to its "Super Manager" Kenco logistics and the Mars Manteno Facility, by way of an in-house Regional Distribution Manager (RDM).

30. Kenco Logistics, it's "Super Manager" just as any employee would, on an ongoing regular and regimented basis conferred with, Mars, Inc. for directives and goals, while conforming to these directives, and reporting the results of such to Mars, Inc.

31. Just as any manager would, Kenco Logistics a type of "Super Manager" dovetailed their management styles to synergize the mandates of it employer, Mars, Inc. and public policy to meet the performance management goals set by Mars, Inc.

32. Pointedly, Public policy drives industry standards that drive company policy. Specifically, in this case the Food, Drug and Cosmetic Act (FD&C Act), Food Safety and Modernization Act (FSMA, the 2001 Bioterrorism Act and other Acts, as well as, The World Health Organization (WHO), Codex Alimentarius, FAO and other organizations, shape and form the various recognized Global Food Safety Initiative (GFSI) benchmarks; which include but are not limited to: FSSC 2200, ISO2200, BRC, IFS, SQF and other food safety standards.

33. Specifically, Kenco Logistics was assigned the task of implementing a written Quality Management System based upon the current non-documented procedures and protocols being performed at the Mars Manteno facility. This standard was based upon ISO, the International Standard of Organization.

34. Kenco Logistics Quality Management System is based on an ISO, the International Standard of Organization; the specific ISO standard is 9001:2008.

35. Specifically, Kenco Logistics implemented a written Quality Management System at the Mars Manteno Facility.

36. Mars, Inc. and Kenco Logistics are both certified to some Global Food Safety Initiative standard and or benchmark.

37. Pointedly, yearly external audits are required to remain compliant to the Quality Management System, along with internal audits.

38. Furthermore, the Federal Government under the 2001 Bioterrorism Act and the 2011 Food Safety Modernization Act, require all august body participants along the food supply chain to be complaint; Essentially from farm to fork.

39. Kenco Logistics publicly purports to "ensure all requirements are documented according to the ISO-9001:2008 structure and are incorporated into the sites' standard operating procedures. Through regular internal audits and program development, Kenco's quality

team provides support and industry expertise in FDA, OSHA, EPA, DEA, DOT, and numerous other compliance agencies."

40. Specifically, the system implemented at the Mars Manteno facility was to be a standardization of all policies, procedures, mandates and the like.  This included, but was not limited to job analysis, job descriptions and the corresponding operating procedures for each job.  These and all-encompassing documents are authored and vetted.

41. Pointedly, all Quality Management systems, including but not limited to this Mars Manteno Quality Management System, mandate that all documents are to be catalogued, controlled, maintained, and stored amongst other requirements.

42. Pointedly, Kenco Logistics developed an Appendix A for the Mars Manteno Facility that catalogued the corresponding standardized documents for the Mars Manteno Facility.  This included but was not limited to Job descriptions, Standard Operating Procedures, policies, and forms.

43. Pointedly, Kenco Logistics also maintained an Appendix F, a higher matrix of Appendix A, top tier documents, that catalogued the corresponding standardized documents for the Kenco Logistics as a whole, inclusive of the Manteno Facility, as well as, other managed facilities.  This included but was not limited to Job functions by titles, Standard Operating Procedures, policies, forms and the like.

44. Pointedly the documents itemized in Appendix A for the site super ruled those documents in Appendix F because they were customized to the specific employer's and site requirements.

45. To ensure proper dissemination and training, each policy and or procedure are to be signed off by each employee and a record retained of such.

46. Pointedly, no deviation from any policy and procedure is to occur, without following the procedure of the exception procedure and an approval of such on any level.

47. President, David Caines, of the Kenco Group referred to the employees of the Mars Manteno site specifically as Mars, Inc. employees.

48. The "Super Manager's" role was to manage and enforce the directives and mandates of Mars, Inc. at the Mars Manteno facility that was owned, leased and operated by Mars, Inc. since the Mars, Inc. Manteno inception in 1999.

49. The means test for an employee is below based upon the Common-law test, the Economic realities test, and the Hybrid test and the results.

| | Determination test whether a worker is an employee | |
|---|---|---|
| **Test** | **Description** | **Laws under which test has been applied by** |
| Common-law test (used by Internal Revenue Service (IRS)) | Employment relationship exists if employer has right to control work process, as determined by evaluating totality of the circumstances and specific factors | Federal Insurance Contributions Act<br><br>Federal Unemployment Tax Act<br><br>Income tax withholding<br><br>Employment Retirement and Income Security Act<br><br>National Labor Relations Act<br><br>Immigration Reform and Control Act (IRS test) |
| Economic realities test | Employment relationship exists if individual is economically dependent on a business for continued employment | Fair Labor Standards Act<br><br>Title VII<br><br>Age Discrimination in Employment Act<br><br>Americans with Disabilities Act<br><br>Family and Medical Leave Act (likely to apply) |
| Hybrid test | Employment relationship is evaluated under both common-law and economic reality test factors, with a focus on who has the right to control the means and manner of a worker's performance | Title VII<br><br>Age Discrimination in Employment Act<br><br>Americans with Disabilities Act |

| | Worker's status under the common-law test | |
|---|---|---|
| Factor | Worker is an employee if— | Entity |
| Right to control | Employer controls details of the work | Mars, Inc. controls details of the work |
| Type of business | Worker is not engaged in business or occupation distinct from employer's | Kenco Logistics, its "super Manger" operates in business that is not distinct from its employer's business |
| Supervision | Employer supervises worker | Day to day workflow dictated & overseen by |
| Skill level | Skill level need not be high or unique | Kenco Logistics, its "Super Manager" did not perform any special task or have a special skill set unique, or substantial training than the current employees and departments of the Mars Manteno facility. |
| Tools and materials | Employer provides instrumentalities, tools, and location of workplace | Mars, Inc. provided the instrumentalities and tools of workplace and work site to its "Super Manager" and the other employee's. Mars Manteno is part of a network of Mars, Inc. Warehouses. |
| Continuing relationship | Worker is employed for extended, continuous period | Kenco Logistics, its "Super Manager" was employed for an extended period of timer |
| Method of payment | Worker is paid by the hour, or other computation based on time worked is used to determine pay | Kenco Logistics, its "Super Manager" was paid a management fee to manage the Mars, Inc. Manteno facility. |
| Integration | Work is part of employer's regular business | Kenco Logistics, the "Super Manager" work is part of employer's regular business |
| Intent | Employer and worker intend to create an employer-employee relationship | Employer and worker intend to create an employer-employee relationship when it entered into an agreement for Kenco Logistics to manage its mars Manteno facility. |
| Employment by more than one firm | Worker provides services only to one employer | Kenco Logistics, the "Super Manager" line of business is to provide management services. |

50. Title VII provides that it is "an unlawful employment practice for an employer to fail or refuse to hire or discharge any person or otherwise … to discriminate against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, age or natural origin."

51. Title VII is at bottom an enterprise liability scheme. It is structured to hold employing entities—not individuals—accountable for discrimination within the organization.

52. The Mars-Manteno facility, since its inception in 1999, has been a fully functional facility comprised of a General Manager, Operations Manager, Accounting and Human Resource Department, supervisors, and workers.

53. Kenco, Mars, Inc., "Super Manager" provided back office support to the accounting and human resource department, as well as, the implantation of Kenco management styles, including but not limited to: Kenco Quality Management System (KQMS), an ISO 9001:2008 based system, Operational Excellence and Continuous Improvement based upon Lean and Six Sigma principles.

54. The specific back office support provided by Kenco entailed pass thru on the invoices/bills of the Mars Manteno facility to Mars, Inc. after they were receipted, reconciled and the like at the Mars Manteno Facility Accounting Department.  In addition to the invoice pass thru to Mars, Inc., Kenco also passed thru the Mars Manteno payroll by issuing the payroll checks, after the payroll had been processed, verified and submitted by the Mars Manteno Accounting Department for the five (5) different payrolls that comprised the Mars Manteno Facility to Kenco's payroll department.

55. The additional specific back office support provided by Kenco was the recruitment and hiring of salaried personnel for the Mars Manteno facility, as well as, other Human Resource support, such as but not limited to: training, benefit administration, and the like.

| Factors | used to determine a worker's status under the economic realities test | |
|---|---|---|
| **Factor** | **Worker is an employee if—** | **Entity** |
| Integration | Worker provides services that are a part of the employer's regular business | Kenco Logistics, the "Super Manager" line of business is to provide management services; therefore, no work was provided outside the regular business of the employer. In addition, no function executed by the "Super Manger" was not being performed at the Mars Manteno facility, including but not limited to General Management, HR, Accounting and the like. |
| Investment in facilities | Worker has no investment in the work facilities and equipment | Kenco Logistics, the "Super Manager" line of business is to provide management services and has no interest in the Mars, Manteno facility. Both Kenco Logistics and Mars, Inc. have indicated that they are independent legal entities of one another. |
| Right to control | Management retains a certain type and degree of control over the work | Mars, Inc. at its sole discretion directed the day to day work flow through The Warehouse Management system (WMS)-SAP ERP. This system provides the structure to process all "goods" movements and in managing stocks in the warehouse complex. The system supports scheduled and efficient processing of all logistics processes within the Mars Manteno warehouse. The WMS is fully integrated into the SAP environment. That allow business processes that are triggered in other application components, lead to the physical goods movement in the warehouse. Organization, control, and monitoring of goods movements are tracked within the WMS. |
| Risk | Worker does not have the opportunity to make a profit or incur a loss | Kenco Logistics, the "Super Manager" was paid a management fee and was not entitled to any profit of Mars, Inc., as they are not a stakeholder in Mars, Inc. Both entities have stated that they are separate legal entities. |
| Skill | Work does not require any special or unique skills or judgment | Kenco Logistics, the "Super Manager" did not perform any duties or tasks that were not or had not been performed at the facility with the exception of the scribing the written procedures already being performed at the Mars Manteo facility. |
| Continuing relationship | Worker has a permanent or extended relationship with the business | Kenco Logistics, the "Super Manager" had an ongoing and working relationship with Mars, Inc.; executing its mandates. |

56. The KQMS style was to standardize the facility to bring compliance to 21CFR110, Food Safety and Modernization Act, 2002 Bioterrorism Act, as well as, any other applicable Global Food Safety Initiative (GFSI) benchmarked schemes; in addition to, streamlining business process, increase efficiency, profitability and accountability.

57. The claims of disparate and disparate treatment and impact were reported to the site Human Resource Personnel, as well as, the Employee Assistance Line-email, phone and fax, Paula Hise, Vice President of Operations, Tammi Fowler, Senior Employee Relations Manager Kenco Corporate, Dan Dey- Corporate Risk Manager, Kelvin Walsh, former General Manager, David Jabaley, Director of Operations, by phone, email, and in-person on numerous occasions.

58. Specifically these claims were made from December 2013 through December 2014

59. Kenco, the "Super Manager" did nothing to investigate, remediate, or mitigate these claims despite having sufficient knowledge of such claims.

60. DOSS was promoted from a Warehouse Associate to a Shift Lead on or about December 9, 2013.

61. Immediately upon DOSS's promotion, he was harassed and subjected to unequal terms and conditions of employment than other Shift Leads, when Walsh failed to pay him the prevailing wage of a Shift Lead upon promotion.

62. This subjugation began to create an animus and hostile work environment for DOSS.

63. DOSS questioned Walsh about the pay disparity and Walsh informed him that do to budgetary reasons, defendant KENCO was not able to give him the prevailing wage, but would administer prorated increases in pay over a period of time.

64. On or about December 16, 2013, unbeknownst to DOSS, KENCO through Tammi Fowler, its then Corporate Senior HR Employee Relations Manager approved and endorsed such actions of Walsh to prorate plaintiff's wages.

65. In late February 2014, DOSS was initially asked by Manzello to go for external training for the implementation of a new warehouse management system called "Red Prairie."

66. "Red Prairie" was a MARS, Inc. MARS Manteno system wide warehouse management system change.

67. MARS, Inc. required external training for the "Red Prairie" conversion, integration, and roll out.

68. In the beginning of March 2014, DOSS complained to Walsh, Manzello, and the Manteno site Human Resource personnel that he was being subjected to unequal terms and conditions of employment by not being paid the prevailing rate of a Shift Lead, as similarly situated, non-black and female Shift Leads.

69. Shortly after having complained to Walsh, Manzello and the Manteno site Human Resources personnel of having been subjected to such unequal terms and condition of employment, DOSS was told by Manzello that he was not going for the external training on the new warehouse management system.

70. No reason was articulated for not giving plaintiff the training on the new system, despite it being a prerequisite to the system change.

71. DOSS was effectively denied training for the mandated system upgrade in March of 2014.

72. DOSS complained to Walsh, Manzello and the Manteno Human Resource personnel about the lack of training, along with the other disparities that he had been subjected to.

73. KENCO, MARS, Inc., "Super Manager" sent all the non-black leads for external training on the Red Prairie warehouse management system in March of 2014.

74. Immediately after DOSS complained of not being trained for the Red Prairie warehouse management system, he began being subjected to continued harassment by Walsh, Manzello and Valerie Lillie

75.    At all relevant times, Kelvin Walsh, Mike Manzello and Valerie Lillie were acting as agents, servants and/or employees of Defendants MARS, Inc. and KENCO.

76. KENCO and MARS, Inc. are liable for the acts and omissions of these individuals pursuant to the principals of ratification, respondeat superior and actual and/or implied agency.

77. Furthermore, upon information and belief Kelvin Walsh, David Jabaley prevented Kenco from taking any remedial action, as it relates to these claims through some contrived scheme to continue to subjugate Doss to unequal terms and conditions of employment, harassment, discrimination, a hostile work environment and retaliation, as well as, conspire against DOSS' federally protected rights.

78. In May of 2014, Kelvin Walsh, a MARS, Inc. employee incited the already hostile and animus work environment by publicly humiliating DOSS after having to return him to work after forcing him to take a drug test under the pretext that he had an accident on equipment while working. Contrary to the reason given him for allegedly smelling like "weed".

79. The initial reasonable suspicious drug testing confrontation was done in front of the entire office workforce including but not limited to the MARS, Inc. Regional District Manager, HR Personnel, other office workers and bystanders.

80. Pointedly Kelvin Walsh continued to foster an animus and hostile work environment by using every opportunity to subjugate DOSS to unequal terms and conditions of employment, pay disparity, ostracization, malicious and cruel comments and the shear refusal to not treat DOSS disparately or disparagingly.

81. MARS, Inc., "Super Manager" Kenco told DOSS that they would investigate the claims.

82.  MARS, Inc., "Super Manager" Kenco misrepresented to Doss that they would investigate these claims.

83. The "Super Manager" Kenco did nothing to investigate, remediate, or mitigate the claims of disparate and disparaging treatment.

84. Pointedly MARS, Inc. had a business need for Leads, as the "Super Manager" Kenco actively and aggressively began internally and externally recruiting for such to meet the MARS Manteno business needs.

85. In tandem, MARS, Inc. would have been apprised of this need, as MARS, Inc. drove the work flow, work assignments and provided directives periodically throughout the day.

86. MARS, Inc. had an onsite Regional District Manager that participated and facilitated those day to day work activities for the Mars Manteno facility.

87. Several Leads were hired and/or promoted while DOSS was on prorated pay.

88. The Leads the "Super Manager" hired were non-African American, non-black, and female.

89. To exacerbate the kindling hostile and animus work environment, the same Leads the "Super Manager" hired were non-African American, non-black, and female, were paid the prevailing rate without proration.

90. One of the same Leads the "Super Manager" hired was non-African American, non-black, female, was given a premium shift than DOSS.

91. The same Lead the "Super Manager" hired was non-African American, non-black, female, were given more overtime than DOSS.

92. The same Lead the "Super Manager" hired were non-African American, non-black, female, was given forty (40) hour weeks when DOSS a more tenured employee shift was routinely cancelled; effectively denying him a full forty (40) hour work week.

93. The same Lead the "Super Manager" hired was non-African American, non-black, female was not qualified for the position, as she could not drive a fork-lift and was not certified to do such.

94. DOSS was also subjugated to harsher discipline, scrutiny, economic sanctions of suspensions, public humiliation, drug and diabetic testing and numerous other malicious acts.

95. In addition, those who were associated with DOSS and opposed such disparate and disparaging treatment were also subjugated to such treatment, including but not limited to suspensions, harsher work assignments, demotions and the like.  For example, but not limited to: Scott Marksteiner and Anastasia Sandness.

96. DOSS made numerous complaints about the pay disparity, the unequal terms and conditions of employment, the lack of work, scheduling and the like to site HR Personnel and management, including the GM, as well as, the "Super Manager's" corporate HR Personnel and Director of Operations.

97. Such pervasive behaviour gave rise to other employees engaging in equally pervasive or overt disparate and disparaging treatment and impact to African Americans and those who opposed such.

98. Seemingly, KENCO did nothing to investigate, mitigate, or address the issue that Kelvin Walsh, Tammi Fowler, Mike Manzello, David Jabaley and Mario Lopez intentionally and willfully did not follow company policy as it relates, to the unequal terms and conditions of employment, unequal pay and other matters.

99. Pointedly, it is unreasonable to believe that MARS, Inc. had no foreknowledge of these matters, as the Regional District Manger's office area was in close proximity of the MARS, Inc. MARS Manteno General Manager's office.

100.      Pointedly, it is unreasonable to believe that MARS, Inc. had no foreknowledge of these matters, as this pervasive disparate and disparaging treatment was the MARS, Inc. MARS Manteno culture.

101.      Whether in part intentionally or unintentionally MARS, Inc. and Kenco conspired to continue to subjugate DOSS to disparate and disparaging treatment and impact; this conduct that constitutes individual liability as well.

102.        Both the MARS, Inc. and KENCO retaliated against him by failing to take corrective action in response to his complaints; in effect condoning the discrimination against him by his supervisor for which liability may be imputed to his employer.

103.        Plaintiff alleges that both entities bear responsibility as his joint employers because various supervisory responsibilities and policy decisions regarding Plaintiff's employment were divided between KENCO and MARS, Inc.

104.        Plaintiff finally contends that these failures were effectuated recklessly by both KENCO and MARS, Inc.

105.        Furthermore, for C-Suite (Corporate Officers) to knowingly and purposely violate company policy by not investigating the claims of disparate and disparaging treatment and impact as mandated by company policy, as well as, violating public policy is truly reckless, unlawful and unconscionable at best.

106.        Plaintiff did not receive proper notice, specifically the original motion filed to move the court to dismiss Plaintiff's complaint counts I-IV.

## REBUTALL

### Dismissal due to lack of timeliness in filing claim Counts I & IV

It was not noticed that 2014CF2858 Right to Sue letter was issued with a date of August 17, 2015.

Moreover, it was believed to have been received with the other Right to Sue Letters that were issued with a date of September 4, 205.

Pointedly, the Right to Sue letter indicates that the time frame begins from the date of receipt of the correspondence not the date of issuance.

Conclusively, Plaintiff denies that the filing was untimely and filed within the proper time frame.

Furthermore, intertwined and comingled within these cause of actions are numerous disparate and disparaging events that occurred after the filing of charge 2014CF2858.  To eradicate these counts would also infringe upon the other intentional, purposeful, and retaliatory acts imputed and imposed upon DOSS and would be unfavorable towards Plaintiff.

**Dismal of COUNTS 2 & 3**

Defendant's legal counsel pled to the Human Rights Commission on or about October 5, 2015 that these counts were not proper before the Commission.  Specifically, it states "Counts 2, 3, 4 and 6 are not properly before the Commission because they include causes of action for various torts which are independent of the provisions of the Illinois Human Rights Act.  See e.g. Pavilon V. Kaferly, 204 Ill.App.3d 235 (1st Dist.1980). etc…"  See Exhibit A

Simultaneously, the exact same legal counsel is pleading within this court that these claims are not proper before these courts.

The counts are recited are exactly the same in each forum, with no deviation.

These positions are diametrically opposed to one another and cannot coexist under the law.

Pointedly, if these counts are not proper in either forum, then there leaves no justice or fair and equitable remedy to be applied.

It has been noted that equitable relief is available for the intentional infliction of emotional distress.

Moreover, as it relates to the intentional infliction of emotional distress the below mentioned are recitations of Uncited allegations related to the ongoing and intentional infliction of emotional distress.

**For example:**

Mars, Inc. "Super" Manager has a policy as it relates to Compensation or Job Change Procedures- CP-HR-6.2.1006.  "The purpose of this procedure is to provide a uniform procedure for all wage increase and salary promotions. "  Exhibit 1

The procedure also indicates that the General Manger must approve all compensation or job changes.

DOSS was promoted to Lead Warehouse Associate in December of 2013.

DOSS's pay was to be increased to the standard prevailing set rate of a Lead Warehouse Associate, as it had been for external hires and internal promotions immediately preceding and proceeding DOSS' promotion.  Exhibit 2

However, the General Manager, Kelvin Walsh, seemingly felt that DOSS should be subjugated to different terms and conditions of his employment as a Lead Warehouse Associate with respect to his compensation; while being expected to perform wholeheartedly and full-fledged the duties of the Lead  Warehouse Associate.

No other employee in any position had ben subjugated to such terms and conditions of their employment as to have their pay incrementally disseminated over a period of time.

Pointedly, there were no intermediate performance goals set during this period of time to be met to even begin to legitimize such an action.

DOSS questioned Walsh about this term and condition.  Walsh indicated that it was due to budgetary reasons that this measure was being instituted.  DOSS contended that he was being treated differently and was told that this was the term and condition extended with his job offer.

Walsh went on further to legitimize this action by conferring with Tammi Fowler, Sr. HR employee Relations Manager of Kenco logistics, about this plan of action.  Walsh indicated that Fowler stated that it was okay to parse out DOSS' pay over a period of time.  Exhibit 3

Fowler was located in Chattanooga, TN at the Kenco Logistics corporate offices.  Leonard Szplett, HR/Accounting Manager of the Mars Manteno facility reported to Fowler with a dotted line to Walsh.

Walsh by passed and usurped Szplett and conferred with Szplett's supervisor about this deviation in normal and best pay practices.

Szplett openly opposed the disparate and disparaging treatment and impact imposed upon African-Americans and those who opposed such treatment.

Szplett, along with McCurry also managed the Mars Manteno Facility operating budget of over 20 Million dollars.  To the best of his knowledge there was not budgetary reason that would have necessitated this action being imposed upon DOSS.

Company policy dictates that any deviation in policy or procedure must be for a valid business reason only and approved by the author of the policy, accompanied by a business case to support this change.
Although an exception was made, it did not follow protocol nor was Fowler the author of the policy.  See Exhibit 4 Policies related to Quality Management System ISO 9001:2008, CP-BP-4.2.1.001 and exception form, ISO-QE-4.2.4.001, ISO-BP-4.2.3.001, and the superseding all-encompassing policy POL-BP-300

Doss was finally increased to full Lead pay the last April of in 2014.  Exhibit 5

**Example #2**

DOSS came to the facility, on or about May 5, 2014, on his scheduled day off, to speak with IT about his jacket that had been taken from him while working on the second shift the night before. See Exhibit 6

The Operations Manager and Quality Coordinator coerced DOSS into swiping in on the clock; under the guise of being mandated to take a drug test under a reasonable suspicion of being under the influence because of allegedly smelling like "weed."

The confrontation about DOSS allegedly smelling like "weed" took place in front of a number of employees at the facility.  DOSS closed the door to the Operations Manager's office and was reprimanded for closing the door, so that the other employees of the facility could not be privy to the heated exchange.

Seemingly, the Operations Manager and the Quality Coordinator intentionally and systematically wanted to continue to humiliate, intimidate, stereotype and marginalize DOSS in front of others.

DOSS was informed by Mike Manzello, the Operations Manager and Quality Coordinator, Valerie Lillie, through an abuse of power, that a failure to swipe in and submit to the drug test as directed would have led to immediate termination.

There are two (2) policies that address and relate to reasonable suspicion CP-RM-6.2.2.310, the associated form that accompanies this policy is CP.RM.6.2.2.310-1 and Drug Screen Procedure CP-HR-6.4.001 §3.16.1.  See Exhibit 7

The form that was actually given to DOSS for the drug and alcohol test was CP-RM-6.2.100-1. This correlates to policy CP-RM-6.2.100 Workers' Compensation Procedures.   See Exhibit 8. This policy and form is suggestive of DOSS having had an incident or accident on equipment while working; specifically for DOSS this would have been limited to Material Handling Equipment, forklift, cherry picker, etc.

Not only was DOSS subjugated to a drug test, but was also subjugated to an alcohol test as well.

According to the form the alcohol test is only to be checked if there was a suspiciousness of alcohol.  The allegation was that DOSS smelled like "weed," but yet DOSS was tested for both.

An indictment that if they could not get DOSS on one they would get him on another; again another contrived scheme of stereotyping and entrapment.

Pointedly, the reasonable suspicion policy is specifically geared toward employees governed by the Department of Transportation; specially those employees at the facility that held (CDL) Commercial Driver's License.  DOSS has never possessed a CDL.

This is an abuse of authority of power and a gross misapplication of company and public policy used as a tool of harassment, humiliation, intimidation, marginalization, stereotyping and retaliation against DOSS for complaining about:

> 1.) Being paid disparately as a lead in comparison to other leads who were promoted internally and hired externally immediately preceding and proceeding DOSS' promotion.

> 2) Being marginalized and ostracized from the training required to operate in the newly implemented warehouse system, which is an essential function of DOSS's job. Pointedly, DOSS was selected to go for externally training then deselected, as well as, being ostracized into the warehouse when internal training was taking place; as well as,

> 3) Having the shift that DOSS was assigned to run and supervise being constantly cancelled and eventually being permanently cancelled. Effectively leaving DOSS at times without a set schedule to procure and secure a 40 hour work week, as other employees who not only enjoyed 40 hour work weeks, but in excess of 20-30 hours of additional overtime.

*Consequently to corroborate and substantiate this chemical testing for various substances* including, but not limited to drug and alcohol, DOSS was couched as having had an accident while working. Such an instance of having a worktime incident/accident necessitates and mandates this type of testing under company policy.

Coercing DOSS to swipe in, the application of the reasonable suspicion concept to necessitate testing, as well as, the use of the workers' compensation policy, yielded itself for a legitimate non-discriminate reason to terminate DOSS.

Pointedly, if DOSS was found positive for any of these substances, it now created a legitimate non-discriminate reason for termination that could survive any type of complaint or allegation raised by DOSS.

To further exacerbate the matter, DOSS was accompanied by a co-worker to the drug testing facility; another form of intentional humiliation, harassment, intimidation, stereotyping and the like.  No other employee had been subjugated to such.

MARS, Inc. "Super" Manager, Kenco Logistics had gone so far as to inform employees that vacations were on hold because they were not expecting DOSS to return to work; necessitating a workforce to cover this gap.

Despite being so assured that DOSS would be positive and to their chagrin DOSS was negative to the drug and alcohol test.   See Exhibit 9

Immediately after the results were obtained and in further contrivance, management began spreading defaming and maligning rumors that DOSS had altered his test results some kind of way to achieve a negative result.  Specifically, it was alleged that DOSS had made a stop, met someone, received something and then proceeded to the drug testing facility.

Pointedly, if this was true that the sample had potentially been compromised and not a secondary scheme to further intentionally humiliate, harass, intimidate, and stereotype DOSS or combination thereof, as well as, avoid culpability there is a provision under the same guidelines for a beach in the command of the chain of custody that should have been exercised.

This would have required that the sample submitted be sequestered and evaluated against a new sample for comparison.

This did not occur nor was there ever any mention of such.

However, MARS, Inc. and its manager, Kenco Logistics submitted to the Illinois Department of Human Rights statements to support this stance without vetting and proof texting the allegations.

In addition, according to company policy, investigate notes and dispositions are to be included in the employees personnel file.  This information and other relevant documents were not included in DOSS' file, but apparently maintained in another fashion outside the scope of the standard operating procedures for personnel file/document retention, as well as, the Incident Reporting and Opportunity for Improvement policy standards.

Under the direction of Kelvin Walsh, General Manager of the Mars Manteno Facility, DOSS was informed that he could return to work by Leonard Szplett, the HR/Accounting Manager of the facility.

The facility had staggering shifts throughout the day to address business needs and maximize coverage. DOSS' regular shift began at 1:00 p.m. DOSS came to the shift meeting and Walsh crassly and condescendingly asked DOSS "what was he doing here?"

Pointedly, Walsh knew without a shadow of a doubt why DOSS was there, as he had instructed Szplett to phone him and instruct him to return to work; another blatant, excessive, and egregious abuse of authority and power by the General Manager, Kelvin Walsh.

DOSS reported these actions to the Site HR Personnel, Edith McCurry, as well as, by telephone and facsimile on May 5th, 12th, and 13th of 2014 respectively. See Exhibit 10. Indicating at great length the disparate and disparaging treatment and impact suffered and imposed upon him.

On or about May 14, 2014, DOSS spoke with Paula Hise, the VP of Operations and enumerated such to her.

**Example 3**

In June of 2014 Tammi Fowler, Sr. HR. employee Relation Manager held a Civil Rights meeting for management at the MARS Manteno Facility.

DOSS was not invited to the meeting, despite DOSS holding a management position at the facility of a Lead Warehouse Associate, who directed employees, assigned work to employees, as well as, addressed employee issues with authority to recommend and impose discipline.

Upon information and belief, it was stated that the Leads were not invited, so that DOSS would not understand his Civil Rights better.

**Example 4**

Due to the pervasive racially animus and hostile work environment DOSS began to be the subject of scorn and threats by employees.  In particular DOSS had cited a non-black employee for blowing a stop sign while wearing earbuds and operating Material handling Equipment at the Mars Manteno Facility in July of 2014.

After this citation, DOSS became the target of open threats from Karl Meyer.

DOSS reported this to the David Jabaley, Director of Operations for Kenco who was acting as the interim General Manager.
Jabaley told DOSS that he would not investigate the threat unless he had a witness.

Scott Marksteiner emailed Jabaley regarding the threats towards DOSS, as well as, an incident of Meyer's relaying threats to Marksteiner about DOSS.

Jabaley refused to act on this reported incident; despite his request of the corroboration of the matter being fulfilled; a direct violation of company and public policy.  See Exhibit 11

**Example 5**

DOSS was subjugated to a suspension for allegedly being insubordinate to a supervisor on the third (3) shift.

DOSS maintained that the third (3) shift supervisor began questioning him about paperwork that was left in the bin.  DOSS indicated that it was not his nor relevant to his shift.

DOSS' immediate supervisor Marksteiner was present and proper protocol would have dictated that any conversation relative to shift work be between the supervisors, especially since they were both present.

DOSS was suspended as a result of the exchange for allegedly being insubordinate.

Marksteiner, DOSS' supervisor and Noah Richcreek another 2nd shift Lead corroborated the accounts of the evening substantiating that DOSS had not been insubordinate.  Pointedly they emailed their accounts of the situation to Mike Manzello, Operations Manager, David Jabaley, Director of Operations Kenco Corporate, acting site GM, and Edith McCurry site HR Administrator.  See Exhibit 12

DOSS was still suspended.

The suspension lasted six (6) days on a pending investigation that had not included DOSS up until that point.

DOSS emailed HR about the impending investigation on or about August 13, 2014 and the lack of responsiveness, the imposed barriers to communicate, and the disposition of the matter.  See Exhibit 13

The suspension lasted more than nine days, and did not follow the Opportunity for Improvement Policy. See Exhibit 14.

Tami Fowler emailed and stated that the investigation was still under way and asked for a valid number to contact DOSS, as if to say that the number that was on file was invalid and that was the reason a disposition had not been rendered.  See Exhibit 15

DOSS contact information had remained the same since he had been hired in 2012.

DOSS followed up with an email regarding the eventual investigation with Fowler. See Exhibit 16

DOSS was presented with a write up on August 21, 2014 regarding the suspension.  DOSS opposed the suspension, the handling and the like there of the matter. See Exhibit 17

MARS, Inc. "Super" Manager Kenco failed to provide the information submitted on DOSS' behalf to the Illinois Department of Human Rights, as well as, including the investigation notes and disposition in DOSS' personnel file.  The inclusion of such is mandated by the Opportunity for Improvement and the Personnel Document Retention Policy.  See Exhibit 14 and 18 respectively.

**Example 6**

Upon DOSS' return to work, Valerie Lillie ran up to DOSS while McCurry was issuing his badge and took his picture and ran off.

Lillie maintained that she was instructed to do by Jabaley because of the type of shoes DOSS had on in the picture room at the Mars Manteno Facility.  See Exhibit 19

These are just a few examples of the Mars, Inc. "Super" Manager's behavior that was coercive, retaliatory, and beyond the norms of a typical employer-employee relationship.  These behaviors demonstrated repeated misconduct systematic intentionality, purposefulness, over an extended period of time, of disparate and disparaging treatment and impact, coupled with the inciters of such behaviors being management on the site and corporate levels.

Such repeated and egregious misconduct, despite DOSS' opposition to such, caused DOSS to be mentally and physically stressed to the point where he had to obtain medical care to address his mental and physical conditions, on a medical leave of absence.

Such behavior was more than bad manners, insults or the like, but extreme, malicious, absurd, mean-spirited and intentional.  Creating more than a hostile and animus work environment that any reasonable person could tolerate.

This behavior directly correlates to MARS, Inc. "Super Manager" Kenco admitted known pattern, practice of treating African-Americans disparately and disparagingly than its non-black employees to the Virginia Eastern Court in case number 3:10-cv-00668, as well as, adverse employment decision making towards African Americans, with some of the same Attorneys of fact making less than genuine representation to various regulators during the process of this administrative remedy.  See Exhibit 20

**With regards to Count 3** Plaintiff recites his rational and reasons that constitute the misrepresentations made by Defendant that led Plaintiff to believe that would be given unbiased investigations, treatment and the like, as well as, highlighting the numerous misrepresentations made to the Illinois Department of Human Rights with regards to applicable policies/procedures,

individuals alleging to have firsthand knowledge giving testimony and accurate recounts of incidents that occurred, systematically eliminating persons who had firsthand knowledge such as, but not limited to Edith McCurry and Leonard Szplett, refusing to reflect the personnel file as required by company policy to include investigation and disposition notes that contradicted Defendant's action taken against Plaintiff, as well as, knowingly trying to obstruct and impede justice by making misrepresentations to the court about the proper posturing of claims within each venue to willfully and intentionally evade justice and culpability in any forum.

Last, but not least the audacity to characterize the Plaintiff's claims as frivolous to the courts and any other person is unconscionable, lacking in integrity, and a blatant disrespect to the law. Once again further minimalizing and subjugating the Plaintiff to disparate treatment and impact of the law, marginalizing his cognitive ability to assimilate and matriculate what has happened and benchmark it against the law and seek equitable remedies for such, as well as, affirming the train of thought or the air of contention that racism is acceptable.

Furthermore, it is not frivolous to be expected to be treated with dignity, honor and respect. Paid equally and accordingly, as well as, have the same rights and privileges afforded to and enjoyed by persons of these United States. It is unacceptable to be treated subhuman, less that a person or poorly, or continually be subjected to the 3/5 of a person doctrine based on the color of one's skin.

     **WHEREFORE,** Plaintiff requests that this Honorable Court rule in his favor and deny DEFENDANT's Motion.

Respectfully submitted,
**NATHAN DOSS**

By: _____
Pro Se
NATHAN DOSS
1124 Abbott Lane
University Park, IL 60484
708.543.0536

_____
Date

## CERTIFICATE OF SERVICE

Please take notice that on May 20, 2016 I, Nathan Doss, hereby, certify that I did file a Response TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT with the Central District of Illinois Urbana Division in the foregoing matter of Case No. 15-cv- 2287-CSB-EIL and have served the persons identified on the docket's service list via regular mail.

Pro Se
NATHAN DOSS
1124 Abbott Lane
University Park, IL 60484
708.543.0536

Jody Wilner Moran
Julia P. Argenieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Il 60601
312.787.4949