**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| Nathan E. Doss _____ ) | |
| ) | |
| Plaintiff                        ) | **CIVIL ACTION** |
| ) | |
| v.                             ) | NO.  15-2287 |
| ) | |
| KENCO LOGISTIC SERVICES, LLC, a ____  ) | |
| ) | |
| Tennessee Limited Liability Company, Mars, Inc. ) | |
| ) | |
| Jay Elliott, Kelvin Walsh, Tammi Fowler, Lori _  ) | |
| ) | |
| Varvel, David Jabaley, Mario Lopez, Stacey Bushey ) | |
| ) | |
| Paula Hise, Dan Dey, Russel Schippits, Melissa Hansen ) | |
| ) | |
| John Detwiler, IDHR & IDHR Staff, Office of The ) | |
| ) | |
| Executive Inspector General-Ill and unknown_____ ) | |
| ) | |
| "Kenco Co-Conspirators" Mike Manzello, Valerie Lillie_ ) | |

## AMENDED COMPLAINT OF EMPLOYMENT DISCRIMINATION

1. Plaintiff [X] DOES ☐DOES NOT demand a jury trial.

### I. PARTIES

2. The plaintiff is Nathan E. Doss____, whose street address is 1124 Abbot Lane, (city)

University Park, (state) IL___(ZIP) 60461__  (Plaintiff's telephone number) 708.265.6589


3. The defendant is KENCO LOGISTICS, a Tennessee Limited Liability Company, Mars, Inc.,

Kelvin Walsh, David Jabaley, Tammi Fowler, Lori Varvel, Mario Lopez, John Detwiler, Jay

Elliott, IDHR,  & IDHR Staff, IL Office of Inspector General, and unknown "Kenco Co-

Conspirators, Melissa Hansen, Russell Schippits, Stacey Bushey whose street address is See

Attached ,(city)_____(state) _____(ZIP) ____(Defendant's telephone number) (    )

4.  The alleged discrimination occurred at <u>Mars-Manteno Facility 1125 W. Sycamore, Rd</u>

(city)<u>Manteno</u>_____ (state)<u>Il</u>____ (ZIP) <u>60950____</u>

5.  The plaintiff [*check one box*]

(a)         ❑         was denied employment by the defendant.

(b)         ❑         was hired and is still employed by the defendant.

(c)| X |   ❑         was employed but is no longer employed by the defendant.

6.  The defendant discriminated against the plaintiff on or about, or beginning on or about,

(month)_____, (day)_____ , (year) __1999__ .

## II. JURISDICTION

7.  Jurisdiction over this claim is based on 28 U.S.C. § 1331. Plaintiff alleges that the

defendant(s) discriminated against Plaintiff because of Plaintiff's:

☐  Age (The Age Discrimination in Employment Act, 29 U.S.C. § 621)

❑  Color (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

| X |  Disability (The Americans with Disabilities Act, 42 U.S.C. § 12101 and/or

The Rehabilitation Act, 29 U.S.C. § 701)

❑  National Origin (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

| X | Race (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

| X | Race (42 U.S.C. § 1981)

❑  Religion (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

| X | Sex/Gender (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

❑  Sex/Gender (Equal Pay Act, 29 U.S.C. § 206)

| X | Use of Leave (Family and Medical Leave Act, 29 U.S.C. § 2611)

| X |  Other (list): <u>Conspiracy, Intentional and Willful Interference, Aiding and</u>
<u>Abetting, Coercion, Retaliation,  Intentional Infliction of emotional distress,</u>
<u>WARN ACT, violation of 42 U.S.C. §1983, 1985 and 1986</u>

8.  Plaintiff ❑ HAS ❑ HAS NOT filed a charge before the United States Equal Employment

Opportunity Commission (EEOC) relating to this claim of employment discrimination.

**[Attach a copy of charge to this complaint.]**

9.  Plaintiff ❑ HAS ❑ HAS NOT filed a charge before the Illinois Department of Human Rights

(IDHR) relating to this claim of employment discrimination. **[Attach a copy of charge to**

**this complaint.]**                      2

10. Plaintiff ☒ HAS ☐ HAS NOT received a Right to Sue Notice. If yes, Plaintiff's Right to Sue

Notice was received on or about (date) October 17, 2016 _____.

**[Attach copy of Notice of Right to Sue to this complaint.]**

### III. FACTS IN SUPPORT OF CLAIM

11. The defendant intentionally discriminated against Plaintiff [*check only those that apply*]:

(a) ☐      by failing to hire the plaintiff.

(b) ☐      by terminating the plaintiff's employment.

(c) ☒      by failing to promote the plaintiff.

(d) ☒      by failing to stop harassment;

(e) ☐      by failing to reasonably accommodate the plaintiff's disabilities.

(f) ☐      by failing to reasonably accommodate the plaintiff's religion.

(g) ☒      by retaliating against the plaintiff because the plaintiff did something to assert rights protected by the laws;

(h) ☒      by coercing, intimidating, threatening or interfering with the plaintiff's exercise or enjoyment of rights;

(i) ☒      with respect to the compensation, terms, conditions, or privileges of employment;
j ) ☐      other (specify):  Hostile and Animus Work Environment Based on Race and
☒

retaliation, Misrepresentation, Intentional Infliction of Emotional Distress, willful

interference, Conspiracy to violate protected rights based upon race, coercion,

failure to prevent the violation of persons protected rights under U.S.C. § 1985 &

1986, Conspiring with a governmental agency to violate the protected rights of

persons under U.S.C. § 1983

12. State here briefly and as clearly as possible the essential facts of your claim. Describe precisely how each defendant in this action is involved. Give dates and places. Concentrate on describing as clearly and simply as possible what employment action or situation you allege to have been illegal and how it violated your rights. It is not necessary to make legal arguments or cite any cases or statutes.

See Attached

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

13. THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a) ❏     Direct the defendant to hire the plaintiff.

(b) ❏     Direct the defendant to re-employ the plaintiff.

(c) ❏     Direct the defendant to promote the plaintiff.

(d) ❏     Direct the defendant to reasonably accommodate the plaintiff's religion.

(e) ❏     Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f) ❏     Direct the defendant to (specify): _____

4

_____

_____

_____

_____

_____

(g) ☒   If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h) ☒   Grant such other relief as the Court may find appropriate.

(Plaintiff's signature)

Nathan E. Doss

(Plaintiff's name)

1124 Abbot Lane

(Plaintiff's street address)

(City) University Park _____   (State) IL   (ZIP)  60461 _____

(Plaintiff's telephone number) (708) –265-6589 _____

Date: January 13, 2017

5

Addresses:

<u>Kenco- Kenco Logistics 2001 Riverside Dr., Chattanooga, TN 37406</u>

<u>Jay Elliott, David Jabaley,  Dan Dey Paula Hise and the unknown "Kenco Co-Conspirators"- C/o Kenco Logistics 2001 Riverside Dr., Chattanooga, TN 37406</u>

Kelvin Walsh- 1045 W Crossroads Pkwy, Romeoville, IL 60446

Mike Manzello- 403 South Peck, Gardner, IL 60424

Tammi Fowler- 400 Birmingham Hwy, Chattanooga, TN 37419

Melissa Hansen-549 Mallard, Coal City, IL 60416

Russell Schippits-3105 W. Jefferson, St. Joliet, IL 60435

Stacey Bushey-1125 W. Sycamore, Manteno, IL 60950

Valerie Lilley- 11143 Eggleston Ave, Chicago, IL 60628

IDHR & IDHR Unknown Staff & John Detwiler-100 W Randolph St, Chicago, IL 60601

Office of Executive Inspector General- 69 W Washington St #3400, Chicago, IL 60602

Mario Lopez-Warehouse Row, 4019 Industrial Drive, Chattanooga TN 37416

Mars, Inc.- 208 S La Salle St #814, Chicago, IL 60604

III.

## VENUE

4.      Venue is proper in the United States District Court for the Central District of Illinois, Eastern Division pursuant to 28 U.S.C. 1391 (b) wherein Doss worked and where KENCO regularly conducts business and where are wrongful conduct complained of herein occurred.

IV.

## THE PARTIES

## PLAINTIFF

5.      DOSS is a citizen of the United States and is an African American male and at all relevant times herein; he has resided in Illinois, in the County of Will and was an employee of KENCO-Mars within the meaning of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., and applicable case law.

6.      DOSS was employed with KENCO and its predecessors, whom at all times acted as agents of Mars, Inc., since on or about June 1999  through various 3rd party management companies; beginning with 4T's Management Company and then with KENCO since April 2013.

DEFENDANT

7.      At all relevant times herein, Defendant KENCO was a 3rd party Logistics management servicing agent for Defendant Mars, Incorporated employing over 3000⁺ employees nationwide and is a Tennessee and Virginia Limited Liability Company, respectively.

8.      KENCO maintained an office in Manteno, Illinois and currently maintains offices in Bolingbrook, Illinois, and conducts business within the State of Illinois and Cook County and within the judicial district. Defendant KENCO'S primary place of business is in Chattanooga, Tennessee and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, et seq..

9.      MARS, Incorporated currently maintains an office in Manteno, Illinois. Defendant Mars, Inc. primary place of business is in Mclean, Virginia and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, et seq..


V.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

DOSS has complied with the administrative prerequisites of §506 of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5 as follows:


10.      On or about, April 7, 2015, Doss timely filed a formal charge of discrimination with the Illinois Department of Human Rights (hereafter the "IDHR") which was cross-filed with the Equal Employment Opportunity Commission (hereafter "EEOC") as Charge Numbers 2015CF2725 and 21B-2015-01282.

**11.**    DOSS promptly and diligently accommodated all IDHR and EEOC requests for information and fully cooperated in the agency's investigation of this matter.

12.    DOSS has exhausted all available administrative remedies in accord with the aforementioned statutes prior to instituting this Civil Action, and DOSS was issued a Notice of Right to Sue from EEOC on October 12, 2016.  Metered on October 12, 2016 and received October 17, 2016.  No administrative prerequisites are required before a plaintiff files a complaint pursuant to the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

**VI.**

**FACTUAL ALLEGATIONS**

13.    At all relevant times, Defendants KENCO and MARS, Inc., employed in excess of fifteen (15) employees for at least twenty (20) calendar weeks in 2013, 2014 and 2015.

14.    At all relevant times, all matters regarding compensation, terms, conditions, rights and privileges of DOSS's employment were governed and controlled by Defendant(s)  MARS and KENCO.

15.    At all relevant times DOSS possessed the skills, experience and qualifications necessary to work in his employment position and adequately and completely performed all of the functions, duties and responsibilities of her employment with Defendant KENCO.

16.    KENCO, upon information and belief was acting as the agent of Mars and in its conduct and actions as alleged herein and was acting in a capacity within the scope of its authority, or, if said conduct was outside the scope of its authority, said conduct was known; authorized and ratified by Mars.

17.    Plaintiff filed charges that were dually filed at the Illinois Department of Human Rights and EEOC.

18.     MARS, Inc., and 4T's management through ingenuity and family alliance collaborated, championed, and implemented the vertical startup of the MARS Manteno facility.

19.     The MARS Manteno facility is a co-pack, warehouse and distribution center for Mars, Inc.

20.     The MARS Manteno facility has been in operation since 1999.

21.     The MARS Manteno facility was managed by 4T's, a thru put, from 1999 until 2013.

22.     The Mars-Manteno facility, since its inception in 1999, has been a fully functional facility comprised of a General Manager, Operations Manager, Accounting and Human Resource Department, supervisors, and workers.

23.     MARS, Inc. specifically provided on a daily basis:

     a.     On site Regional District Manager

     b.     Morning meetings regarding the daily "Plan"

     c.     Fulfillment orders generated by Mars, Inc. through the WMS-SAP

         (Warehouse Management System and SAP software)

               i. Through put of a Billion pounds or more annually of candy at the Mars Manteno facility

      d.      Mars, Inc. warehouse quality manual

      e.      Cross-functional collaboration between departments

24.      MARS, Inc. routinely and regularly provided incentives to the Mars Manteno employees.

25.      MARS, Inc. issued a Request for Proposal (RFP) in late 2012 or early 2013 to bid on the upcoming management vacancy at the MARS Manteno warehouse and distribution facility in Manteno, IL

26.      MARS, Inc. had a Co-Pack Operation in house at the Mars Manteno Facility, it was run by Jacobson Company.

27.      Kenco Logistics responded to the RFP issued by MARS, Inc.

28.      MARS, Inc. identified and retained the management services of Kenco Logistics in early 2013.

29.      On or about February 15, 2013, 4T's notified the Mars Manteno employees in writing that the owner was retiring, that another distributor would be taking over the MARS account, that it was expected that most employees would be hired to essentially perform the same work, and that technically the plant was being closing under 4T's management.

30.      Kenco Logistics replaced the services of 4T's Management.

31.      Kenco Logistics is a 3rd party logistics company, just as it predecessor, that manages warehouse and distribution centers for other companies.

32.      Kenco Logistics stated to the Illinois Department of Human Rights and the EEOC in its Position Statement beginning on or about November 2014 in case number 2014CF0475, and subsequently again in case number 2014CF2858, 2014CF2992, 2014CF3057, 2014CF3161, 2015CF3162, 2015CF0310, 2015CF0811, 2015CF1145, 2015CF0342, 2015CF0990, 2015CF1315, 2015CA1464, 2014CF3162, 2015CF0003, 2015CF0006, 2015CF0515, 2015CF0516, 2051CF0699, 2015CA1054, 2015CA1590 and others that "Kenco is a third-party logistics company ("3PL") that operates and manages warehouses and order fulfillment operations for other companies."

33.      On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for Mars, Inc.

34.      Kenco Logistics is a privately held company in the state of Tennessee

35.      Kenco Logistics corporate structure, operating structure and legal structuring is not synonymous with any other company.

36.      Kenco Logistics is part of the Kenco Group

37.    Kenco Group current Chairman & CEO is Jane Kennedy Greene

38.    Kenco Group President and COO David Caines

39.    Kenco Logistics was hired to Manage the Mars, Inc. Manteno facility in Manteno, IL

40.    Mars, Inc. is a privately held company in Virginia

41.    Mars, Inc. paid Kenco Logistics a management fee to manage the Mars Manteno facility

42.    Mars, Inc. passed thru their costs through Kenco Logistics with the exception of the lease, taxes, fire protection, insurance, rack expense/amortization, management fee, material handling fee were direct pays of Mars, Inc.

43.    Specifically, Mars, Inc. passed thru Kenco Logistics the salaries of all the employees (temporary and part & full time employees), as well as, any invoices of the Mars Manteno facility.

44.    This function performed was synonymous to that of the services provided by ADP, LLC.

45.    Mars, Inc. managed Kenco Logistics

46.    Specifically, Mars, Inc. continued to provide daily guidance to the Mars, Manteno facility, as it had done in the past with 4T's its former management company.

    a.   On site Regional District Manager

    b.   Morning meetings regarding the daily "Plan"

    c.   Fulfillment orders generated by Mars, Inc. through the WMS-SAP

        i.   Through put of a Billion pounds or more annually of candy at the Mars Manteno facility

    d.   Mars, Inc. warehouse quality manual

    e.   Cross-functional collaboration between departments

47.    Mars Manteno was a part of the network of Mars distribution centers.

48.    Mars Manteno was the Midwest distribution center

    a.   Mars Manteno serviced twelve (12) Midwestern states and Canada

49.    Mars Manteno was infrastructually similarly situated to the other four (4) distribution centers in the network in organization.  For example, but not limited to:

    a.    General Manager

    b.    Operations Manger

    c.    Accounting/Human Resources

    d.    And the like....

50.    Organizationally the Mars Manteno General Manager answered to and conferred with the onsite RDM of Mars, Inc., as a matter of the course of ordinary business operations.

51.    *Black's Law Dictionary* defines "employee" as "a person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.

52.    Mars, Inc. provided and stipulated such terms and conditions of employment, to Kenco Logistics, as well as, compliance; specifically with the Mandates of Mars outlined in the **Mars US Warehouse Quality Manual** and public policy, including but not limited to FSMA (Food safety and Modernization Act, 2002 Bioterrorism Act, CFR Title 21, and any other applicable public policy, just as it would with any employee and as it had done with the previous Management Company at the Mars Manteno Facility and its various other warehouse.

53.    Mars, Inc. required Kenco Logistics and Kenco Logistics agreed to be compliant with Public Policy, as it relates to the codified laws of the land, just as it would with any employee.

54.    Specifically, Mars, Inc. provided Kenco Logistics with company policies, procedures, manuals and the like, just as it would with any employee.  In addition, Mars, Inc. provided the necessary tools to perform the assigned job functions, such as but not limited to: Leasing the facility, the equipment (warehouse and office), the computers, the software, as well as, the maintenance, upkeep and repairs of such, just as it would for any employee.

**55.** Mars, Inc. has a Supplier Code of Conduct

"This Mars Supplier Code of Conduct (Code) sets forth the Mars guidelines and expectations with respect to key areas of responsible sourcing, and ensures that Mars upholds the Principle of Mutuality and provides consistent excellence for our consumers and stakeholders. Content in this Code is informed by the International Bill of Human Rights and the principles concerning fundamental rights set out in the International Labour Organization's (ILO) Declaration on Fundamental Principles and Rights at Work.

This Code and our responsible sourcing program more broadly applies to all of our direct and indirect suppliers in all categories. Direct suppliers are those that contribute directly to the production of finished goods, primarily raw materials and packaging. This includes the suppliers of agricultural goods, farmers and sub-contractors. Indirect suppliers are those that provide goods and services outside of those used in the production of finished goods. *This includes the services and items purchased to construct and run our factories, the transport and warehousing of our products and the marketing services we use to promote our brands and products.*

It is recognized that the circumstances in which our suppliers operate may change and because of this we review the Code every two years to ensure that its content and implementation remain appropriate and effective." Mars, Inc. Supplier Code of Conduct

56.    Specifically, Mars, Inc. provided to Kenco Logistics, just as it had its former management company on a regular and ongoing basis, a comprehensive standard to safeguard the Quality and Food Safety of its products in the outbound pipeline. The document was developed in conjunction with Global Quality and Food Safety Requirements.

57.    Mars routinely conducted management review meetings at the Mars Manteno facility.

58.    Mars conducted these meetings with Defendant Kenco as it had with its predecessor, 4T's in previous years.

59.    Specifically Mars, Inc. operates under five (5) principles- Quality, Responsibility, Mutuality, Efficiency and Freedom.

60.    Mars mandates under their "Quality" principle that they require full compliance with all regulatory and legal requirements in the markets in which Mars is sold.

61.    Mars also mandates under their "Quality" principle that there are accountabilities for all leadership roles, including distribution.

62.    Mars also indicated under their "Quality" principle that the policy is reviewed regularly and communicated.

63.    Specifically, Mars, Inc. set the performance management standards and goals for Kenco Logistics, just as it would with any employee, agent or contractor.

64.    Kenco Logistics because of its multifunctional and multilayers of management types can be coined as a "Super Manager."

65.    Specifically, Mars, Inc. provided it's "Super Manager" Kenco Logistics with ongoing guidance, support and management continually

66.    Specifically, Mars, Inc. provided this support, guidance and management to its "Super Manager" Kenco logistics and the Mars Manteno Facility, by way of an in-house Regional Distribution Manager (RDM).

67.    Kenco Logistics, Mars "Super Manager" just as any employee, agent or contractor would, on an ongoing regular and regimented basis conferred with, Mars, Inc. for directives and goals, while conforming to these directives, and reporting the results of such to Mars, Inc.

68.    Mars specifically dictated the receipt, storage and distribution of its products through the WMS-Warehouse Management System.

69.    The receipt, storage and distribution of products at the Mars Manteno facility was measured metrically and reported directly to Mars, Inc. daily.

70.    The metrics used were Key Performing Indicators that were used to evaluate the performance of the Mars Manteno and other distribution facilities within the Mars network.

71.    Just as any manager would, Kenco Logistics a type of "Super Manager" dovetailed their management styles to synergize the mandates of it employer, Mars, Inc. and public policy to meet the performance management goals set by Mars, Inc.

72.    The synergy of Kenco's management style to Mars, Inc. and public policy is and was a requisite to their business relationship and ratified by Mars, Inc. Supplier Code of Conduct and the management agreement between Mars, Inc. and its "Super Manager."

73.    Public policy drives industry standards that drive company policy. Specifically, in this case the Food, Drug and Cosmetic Act (FD&C Act), Food Safety and Modernization Act (FSMA, the 2002 Bioterrorism Act and other Acts, as well as, The World Health Organization (WHO), Codex Alimentarius, FAO and other organizations, shape and form the various recognized Global Food Safety Initiative (GFSI) benchmarks; which include but are not limited to: FSSC 2200, BRC, IFS, SQF and other food safety standards.

74.    Specifically, Kenco Logistics was assigned the task of implementing a written Quality Management System based upon the current non-documented procedures and protocols being performed at the Mars Manteno facility. This standard was based upon ISO, the International Standard of Organization.

**75.**    Kenco Logistics Quality Management System is based on an ISO, the International Standard of Organization; the specific ISO standard is 9001:2008.

**76.**    ISO 9001:2008 at the time was system used to standardize any organization with a comprehensive, consistent, transparent, accountable, traceable, documented set of policies, standard operating procedures, protocols and forms for every level of an organization.

**77.**    Specifically, Kenco Logistics implemented a written Quality Management System at the Mars Manteno Facility.

**78.**    This standard was to bring compliance to 21CFR part 117, The Food Safety Modernization Act.

**79.**    Mars, Inc. and Kenco Logistics are both certified to some Global Food Safety Initiative standard and or benchmark.

**80.**    Both Mars and Kenco are certified by a Registrar.

**81.**    Mars, Inc. Registrar is Lloyd's Register Quality Assurance, Inc.

**82.**    Yearly external audits are required to remain compliant to the Quality Management System, along with regularly scheduled internal audits.

83.    The Registrar conducts the yearly audits for compliance and documents any non-conformities or non-compliances.

84.    Furthermore, the Federal Government under the 2002 Bioterrorism Act and the 2011 Food Safety Modernization Act-21CFR part 117, require all august body participants along the food supply chain to be complaint; Essentially from farm to fork.

85.    Kenco Logistics publicly purports to "ensure all requirements are documented according to the ISO-9001:2008 structure and are incorporated into the sites' standard operating procedures. Through regular internal audits and program development, Kenco's quality team provides support and industry expertise in FDA, OSHA, EPA, DEA, DOT, and numerous other compliance agencies."

86.    Specifically, the system implemented at the Mars Manteno facility was to be a standardization of all policies, procedures, mandates and the like.  This included, but was not limited to job analysis, job descriptions and the corresponding operating procedures for each job.  These and all-encompassing documents are authored and vetted.

87.    All Quality Management systems, including but not limited to this Mars Manteno Quality Management System, mandate that all documents are to be catalogued, controlled, maintained, and stored amongst other requirements.

**88.**    This system also requires a dedicated person to oversee and coordinate the development, implementation, execution, training, auditing, compliance, and continuous improvement of the quality management system, which includes but is not limited to: Standard Operating Procedures, Job Descriptions, Protocols, Policies, forms to accompany the policies, training, gap analysis, corrective and preventative actions, safety/security, line balancing, KPI's compliance, maintenance, cleanliness, pest control and other cross-functional tasks.

**89.**    Kenco Logistics developed an Appendix A for the Mars Manteno Facility that catalogued the corresponding standardized documents for the Mars Manteno Facility.  This included but was not limited to Job descriptions, Standard Operating Procedures, policies, and forms.

**90.**    Kenco Logistics also maintained an Appendix F, a higher matrix of Appendix A, top tier documents, that catalogued the corresponding standardized documents for the Kenco Logistics as a whole, inclusive of the Manteno Facility, as well as, other managed facilities.  This included but was not limited to Job functions by titles, Standard Operating Procedures, policies, forms and the like.

**91.**    The documents itemized in Appendix A for the site super ruled those documents in Appendix F because they were customized to the specific employer's and site requirements.

**92.**    To ensure proper dissemination and training, each policy and or procedure are to be signed off by each employee and a record retained of such for a specified amount of time.

93.    There are specific record retention guidelines and policies.

94.    Record retention under this ISO system ranged from (3) three-(7) seven years.

95.    Records, current and archived, were to be kept in a designated area.

96.    No deviation from any policy and procedure is to occur, without following the procedure of the exception procedure and an approval of such on any level.

97.    President, David Caines, of the Kenco Group referred to the employees of the Mars Manteno site specifically as Mars, Inc. employees.

98.    Paula Hise Vice President of Operations on numerous occasions refers to the Manteno site as our Kenco Mars facility.

99.    The "Super Manager's" role was to manage and enforce the directives and mandates of Mars, Inc. at the Mars Manteno facility that was owned, leased and operated by Mars, Inc. since the Mars, Inc. Manteno inception in 1999.

100.    Title VII provides that it is "an unlawful employment practice for an employer to fail or refuse to hire or discharge any person or otherwise ... to discriminate against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, age or natural origin."

**101.**    Title VII is at bottom an enterprise liability scheme. It is structured to hold employing entities—not individuals—accountable for discrimination within the organization.

**102.**    The Mars-Manteno facility, since its inception in 1999, has been a fully functional facility comprised of a General Manager, Operations Manager, Accounting and Human Resource Department, supervisors, and workers.

**103.**    Kenco, Mars, Inc., "Super Manager" provided back office support to the accounting and human resource department, as well as, the implantation of Kenco management styles, including but not limited to: Kenco Quality Management System (KQMS), an ISO 9001:2008 based system, Operational Excellence and Continuous Improvement based upon Lean and Six Sigma principles.

**104.**    The specific back office support provided by Kenco entailed pass on the invoices/bills of the Mars Manteno facility to Mars, Inc. after they were receipted, reconciled and the like the Mars Manteno Facility Accounting Department.  In addition to the invoice pass thru to Mars, Inc., Kenco also passed thru the Mars Manteno payroll by issuing the payroll checks, after the payroll had been processed, verified and submitted by the Mars Manteno Accounting Department for the five (5) different payrolls that comprised the Mars Manteno Facility to Kenco's payroll department.

**105.**   The additional specific back office support provided by Kenco was the recruitment and

hiring of salaried personnel for the Mars Manteno facility, as well as, other Human Resource

support, such as but not limited to: training, benefit administration, and the like.

**106.**   The KQMS style was to standardize the facility to bring compliance to 21CFR110, Food

Safety and Modernization Act-21CFR117, 2002 Bioterrorism Act, as well as, any other applicable

Global Food Safety Initiative (**GFSI**) benchmarked schemes; in addition to, streamlining business

process, increase efficiency, profitability and accountability.

**107.**   The claims of disparate and disparate treatment and impact by Doss and others were

reported to the site Human Resource Personnel-Leonard Szplett and Edith McCurry, Kelvin

Walsh-General Manager, Mike Manzello Operations Manager, Mario Lopez-General Manager

Tammi Fowler-Senior Manager Employee Relations, Dan Dey-Director of Risk Management,

Paula Hise V.P. of Operations, and other corporate persons, by email, phone, fax, and in-person

on numerous occasions.

**108.**   Specifically these claims were made in December 2013-Novemebr 2014.

**109.**   At all times, Kelvin Walsh, ("Walsh"), a White, American male, held the position of

General Manager. Walsh was in a position of authority to undertake tangible employment

decisions and/or control the terms and conditions of DOSS's employment with Defendant

KENCO.

**110.**    At all relevant times, Walsh, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

**111.**    At all times relevant, Mike Manzello, ("Manzello"), a White male, held the position of Operations Manager, reporting to Walsh. Manzello was in a position of authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of DOSS's employment with KENCO

**112.**    At all relevant times, Manzello managed operational activities relative to the receipt and distribution of inventory for Mars, Inc., including but not limited to: hiring, scheduling, workflow and the like.

**113.**    At all times, David Jabaley, ("Jabaley"), a White, American male, held the position of Director of Operations at Kenco Logistics a part of the Kenco Group.  Jabaley was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of DOSS employment with Defendant KENCO.

**114.**    At all relevant times, Jabaley, acting on behalf of Kenco Corporate the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

**115.**     At all times, Mario Lopez, ("Lopez"), a White, American male, held the position of General Manager at the Mars, Inc. Manteno facility.  Lopez was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of DOSS' employment with Defendant KENCO.

**116.**     At all relevant times, Lopez, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

**117.**     Lopez reported to the Regional Distribution Manager of the Mars Manteno facility, Robert Coffey.

**118.**     At all times, Tammi Fowler, ("Fowler"), a White, American female, held the position of Senior Employee Manager at the Kenco Corporate.  Fowler was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of DOSS' employment with Defendants.

**119.**     At all relevant times, Fowler, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

**120.**     At all times, Lori Varvel, ("Varvel"), a White, American female, held the allege position of HR Manager at the Mars, Inc. Manteno facility.  Varvel was in a position of authority to

undertake tangible employment decisions and/or control the terms and conditions of DOSS' employment with Defendants.

121.    At all relevant times, Varvel, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

122.    At all times relevant, Valerie Lillie, ("Lillie"), a White female, held the position of Quality Coordinator, reporting to Walsh, Lopez and Varvel.    Lillie was in a position of authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of DOSS's employment with KENCO.

123.    At all relevant times, Lillie coordinated/managed all quality activities relative to the operation and maintenance of the facility, including but not limited to: every site and corporate policy, procedure, protocol and form applicable to the operation of the Mars facility. In addition to that, the quality metrics on the receipt and distribution of inventory for Mars, Inc., quality matrixes and plans, pest control, standard operating procedures, sanitation and safety, as well as, Mars, Inc. requirements and other industry specific regulatory mandates and guidelines such as but not limited to: FDA and OSHA.

124.    In continuum at the Mars Manteno facility, Doss was offered a job as a Warehouse lead at the Kenco Mars facility in Manteno on or about April 2013 by Paula Hise, Vice President of Operations.

125.    The job offer was confirmed in writing outlining the details of the job offer.

126.    Acceptance of the job offer was contingent upon the employees signing and dating the letter.

127.    The letter was also signed by an agent of Kenco Mars or some person on their behalf.

128.    Employment was extended to persons at the Mars Manteno facility in this manner.

129.    DOSS was promoted from a Warehouse Associate to a Shift Lead on or about December 9, 2013.

130.    DOSS was promoted from a Warehouse Associate to a Shift Lead on or about December 9, 2013.

131.    Immediately upon DOSS's promotion, he was harassed and subjected to unequal terms and conditions of employment than other Shift Leads, when Walsh failed to pay him the prevailing wage of a Shift Lead upon promotion.

132.    DOSS questioned Walsh about the pay disparity and Walsh informed him that do to budgetary reasons, defendant KENCO was not able to give him the prevailing wage, but would administer prorated increases in pay over a period of time.

133.    On or about December 16, 2013, unbeknownst to DOSS, KENCO through Tammi

Fowler, its then Corporate HR Director approved and endorsed such actions of Walsh to

prorate plaintiff's wages.


134.    After being subjected to a hostile, animus, and racially charged work environment,

as well as, a mired of retaliatory, discriminatory, harassive, defaming, demoralizing and

unlawful acts, Plaintiff became ill.


135.    In mid-January of 2015 Plaintiff was out on an approved medical leave of absence under FMLA

because Plaintiff was ill.


136.    While Plaintiff was out on an approved medical leave under FMLA, Mars-Kenco logistics lost its

contractual agreement with Mars, Inc. on or about January 21, 2015 and was subject to the federal

and state WARN ACT.


137.    Kenco violated the WARN Act by not notifying me at all of the mass lay**off.**


138.    Mars-Kenco intentionally and willfully interfered with the benefits, terms and conditions of the WARN

ACT **(820 1LCS 65) and 29 USC § 2101** by not notifying me of the mass lay off to meet the required 60

timeframe.

139.    The WARN ACT mandates that employers notify employees of a mass layoff with sixty (60) calendar day notice of such a layoff.

140.    Other similarly situated employees of the Mars Manteno facility managed by Kenco were notified under the WARN ACT of the mass layoff.

141.    Defendant, contrary to its actions in mailing out certified letters to employees, purported to the IDHR and EEOC that the WARN ACT was not applicable to Mars-Kenco as there were on twelve (12) persons affected by the layoff.

142.    Defendant knew that its statement to the IDHR and EEOC regarding the WARN ACT was intentional, willful, obstructive, deceitful, deceptive, manipulating, misleading and a blatant mistruth.

143.    Plaintiff also believes that Defendants actions were a breach of their fiduciary obligation to Plaintiff by Defendants.

144.    Plaintiff believes that Defendant intentionally and willfully subjected Plaintiff to unequal terms and conditions of employment by not notifying Plaintiff of the layoff.

145.    Plaintiff believes that he was subjected to the continuum of unequal terms and conditions in retaliation for complaining about the disparate and disparaging treatment and impact upon him, as well as, those who opposed such treatment of Doss and others.

146.    Plaintiff believes that Defendant intentionally and willfully did not notify Plaintiff because of his race and the racially charged, animus and hostile work environment.

147.    Plaintiff believes that Defendant properly notified non-black employees such as, Harold Bell and Leonard Szplett, who were also on medical leave, according to the provisions of the WARN ACT by U.S. certified mail.

148.    Plaintiff believes that Defendant intentionally and willfully did not notify Plaintiff in retaliation for making internal complaints with Mars and Kenco employees about the unequal terms and conditions of employment, harassment, disparate pay, racially charged, animus and hostile work environment amongst other things.

149.    Plaintiff believes that Defendant properly notified non-black employees such as, Harold Bell, who had not opposed disparate and disparaging treatment and impact of African Americans and others according to the provisions of the WARN ACT by U.S. certified mail.

150.    Plaintiff believes that Defendant intentionally and willfully did not notify Plaintiff in retaliation for making eight (8) external complaints with IDHR and EEOC beginning in May of 2014 until December of 2014, as well as, other regulatory agencies such as OSHA.

151.    Plaintiff believes that Defendant's contrived to continue to violate Plaintiff's protected rights by intentionally failing to notify Plaintiff of the mass layoff under the provisions of the WARN ACT.

152.    Plaintiff believes that Defendant's conspired to continue to violate Plaintiff's protected rights by intentionally failing to notify Plaintiff of the mass layoff under the provisions of the WARN ACT.

153.    Plaintiff also believes that Mars-Kenco logistics intentionally and willfully failed to notify Plaintiff at all by any means of the process and protocol to secure employment with the new manager, as it had with the other employees who were not on FMLA.

154.    Plaintiff believes that Mars-Kenco Logistics intentionally, willfully and recklessly failed to engage in the protected class activities under the Family Medical Leave Act and Americans with Disability Act, when it failed to extend to Plaintiff the same rights and privileges it did to those employees who were not on FMLA or who persons who were not disabled.

   a.    When Defendants failed to inform Plaintiff of the mass lay off

   b.    When Defendants failed to inform Plaintiff of the process to continue employment at the Mars Manteno facility under the new management.

155.    Plaintiff believes that Mars-Kenco intentionally and willfully retaliated against Plaintiff's protected rights under the Family Medical Leave Act and Americans with Disability Act, when it failed to extend to Plaintiff the same rights and privileges it did to those employees who were not on FMLA or who persons who were not disabled.

   a.    When Defendants failed to inform Plaintiff of the mass lay off

   b.    When Defendants failed to inform Plaintiff of the process to continue employment at the Mars Manteno facility under the new management.

156.    Plaintiff also believes that Defendants' actions were intentionally orchestrated, contrived and conspired to cause Plaintiff intentional infliction of emotional distress, economic reprisal, humiliation,

marginalization, and irreparable harms by not informing Plaintiff of the process to secure continued employment at the Mars Manteno facility.

157.    Plaintiff also believes that Defendant in continuum harassed, retaliated and conspired against Plaintiff by intentionally and willfully failing to follow the mandates of the public policy as it related to: The WARN ACT, FMLA, ADA and other applicable mandates.

158.    Plaintiff was notified when Plaintiff had returned to work that Plaintiff had missed his interview for the lead associate position with Excel the new management company.

159.    Plaintiff was advised by Excel that Plaintiff was too had been informed of such interviews by Kenco.

160.    Plaintiff believes that transition team for Defendant Kenco under the layoff was including but not limited to: Tammi Fowler, Lori Varvel, Eddy Register, Mario Lopez and David Jabaley.

161.    Lori Varvel was the current HR Manager at the Mars Manteno facility and was aware that Plaintiff was out on an approved Medical Leave of Absence.

162.    Lori Varvel was responsible for managing the HR functions and payroll at the Mars Manteno facility.

163.    Plaintiff believes that Lori Varvel would have been responsible for compiling the list of persons at the Mars Manteno facility affected by and to be notified of the mass layoff.

164.     Plaintiff also believes that Lori Varvel assisted Plaintiff in obtaining his approved medical leave of absence under FMLA.

165.     Plaintiff also believes that Lori Varvel kept records of persons out on FMLA.

166.     Plaintiff also believes that Lori Varvel was the liaison between Defendant Kenco's third (3rd) party benefits administrator, The Hartford and Plaintiff.

167.     Plaintiff provided documentation to Varvel in January relative to Plaintiff's medical leave of absence.

168.     Plaintiff believes that Mario Lopez was aware of Plaintiff's medical leave, as Lopez directed the day to day work flow of the Mars Manteno facility.

169.     Plaintiff believes that Lopez made adjustments to the work flow because of Doss' extended absence.

170.     Plaintiff knows Defendants newly promoted Operations Manager, Melissa Hansen, had quit in December 2014 and that Defendants had not had an Operations Manager since Hansen quit in December 2014.

171.     Plaintiff believes that Hansen quit because Defendant Kenco's Lopez and Jabaley were instructing Hansen to "lie" to Mars regarding the Mars Manteno facility and its operations.

172.     When Plaintiff returned to work Plaintiff was reassigned to different job duties and tasks outside those of a lead.

173.     Plaintiff was also denied access to the office, email and other fringe benefits associated with being a lead.

174.     Plaintiff believes that Defendants' actions were intentionally orchestrated, contrived and conspired to cause Plaintiff intentional infliction of emotional distress, humiliation, marginalization, and irreparable harms.

175.     Plaintiff also believes that the harassment, unequal terms and conditions, retaliation, and discrimination by Defendants followed the complaint to the IDHR, corporate and HR within such a period of time as to raise an inference of retaliatory motivation.

176.     Plaintiff finally did secure an interview.

177.     Plaintiff was tendered a job offer in writing from Excel the new management company.

178.     Unfortunately, the day before Plaintiff was to start work, Plaintiff's job offer was retracted.

179.     Plaintiff was informed that the only job Plaintiff could have interviewed for and obtained was a lead,

180.    Excel stated that they could not offer me another job because Plaintiff missed his interview.

181.    Upon information and belief Plaintiff was never scheduled for an interview as a lead by Excel or Defendants.

182.    Plaintiff believes that Defendant Kenco, Mario Lopez, David Jabaley, Tammi Fowler, Lori Varvel and perhaps others intentionally and willfully interfered with Plaintiff's prospective employment under the new management company Excel.

183.    Plaintiff believes that Defendant Kenco, Mario Lopez, David Jabaley, Tammi Fowler and Lori Varvel's intentional and willful actions of interference were contrived, vengeful and malice toward Plaintiff.

184.    Plaintiff believes that Defendant Kenco, Mario Lopez, David Jabaley, Tammi Fowler and Lori Varvel's intentional actions of interference were intentionally and willfully contrived to inflict intentional emotional distress and economic reprisal upon Plaintiff.

185.    Plaintiff believes that Defendant Kenco, Mario Lopez, David Jabaley, Tammi Fowler and Lori Varvel intentionally conspired to inflict intentional emotional distress and economic reprisal upon Plaintiff by interfering with Plaintiff's prospective employment opportunities.

186.     Plaintiff also believes that there were other persons involved on the transition team that may have also interfered with Plaintiff's prospective employment opportunities, as well as, other protected rights.

187.     Plaintiff reserves the right to amend this complaint to augment the names of those persons who may have interfered with prospective employment opportunities, as well as, other protected rights.

188.     Plaintiff also reserves the Plaintiff reserves the right to amend this complaint to augment the names of those persons who may have co-conspired against Plaintiff's protected rights.

189.     Similarly situated non-disabled employees were not treated in this manner.

190.     Tina Harris female who was in an accommodated work capacity and intermitted FMLA was not treated in the manner as Plaintiff and others.

191.     Since late December 2013-to date, Kelvin Walsh, Mike Manzello, Stacey Bushey, Russel Schippits, Lori Varvel, Melissa Hansen, Tammi Fowler, Dan Dey, David Jabaley, and Mario Lopez willfully interfered with the violation of my constitutional rights to oppose disparate and disparaging treatment, not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being free from being treated differently because of a hostile, racially charged and animus work environment, a disability, harassment, nepotism, favoritism, racism, being subjugated to harsher and more strenuous work assignments, less pay and less hours afforded to be worked

a.     Plaintiff paid less than other leads immediately preceding and proceeding Plaintiff's promotion, whether internal or external leads.

b.     Plaintiff's overtime garnished; despite other leads have access to unlimited overtime.

c.     Plaintiff on a continuum being publicly reprimanded and humiliated by Defendant.

      i.     Comments regarding Plaintiff's perceived sexual orientation.

      ii.     Accused of "smelling like weed" if front of other employees.

            a.     Forced to swipe in on the clock on Plaintiff's day off.

            b.     Defendant threatened Plaintiff with termination of his employment, if Plaintiff did not conform to Defendant's demands.

            c.     Given a paper by Defendant stating that Plaintiff had an accident on equipment while working; thereby legitimizing the drug test

            d.     Plaintiff was required to take and drug and alcohol test by Defendant

            e.     Escorted to drug testing facility

            f.     Defendant maligned and defamed Plaintiff by stating that Plaintiff altered his drug and alcohol test results in order to pass the drug and alcohol test.

            g.     Defendant contrived this story to justify its actions, as well as, avoid culpability.

h.    Defendant conspired against Plaintiff's protected rights.

i.    Defendants retaliated against Plaintiff when Defendants subjected Plaintiff to a contrived drug and alcohol test.

a.    Defendant went beyond the normal drug testing protocol and added alcohol testing, to ensure or bolster the desired outcome of a positive result.

j.    Defendants also retaliated against Plaintiff when Defendants subjected Plaintiff to threats of an adverse employment decision of termination, if Plaintiff failed to adhere to Defendant's contrived scheme.

k.    Defendants also retaliated against Plaintiff when Defendants conspired and contrived a scheme intentionally and willfully using a company approved form to indicate that Plaintiff had a worktime accident and as a matter of ordinary business course a drug test was to be given.

l.    Defendants knew that using this form coupled with a positive result would a legitimate non-discriminate means to terminate Plaintiff.

m.    Defendants knew that this would cause Plaintiff intentional infliction of emotional distress, extreme embarrassment, economic reprisal, and irreparable harms.

n.      Defendants knew that its actions were reckless, willful, intentional, deliberate, and wanton.

o.      Defendants conduct was extreme and outrageous.

iii.    Repeatedly canceling the shift Plaintiff was to lead and or supervise

a.      Reducing Plaintiff's work hours to less than 40 hours per week

b.      Denying Plaintiff access to overtime because of not working 40 hour weeks

c.      Publicly humiliating Plaintiff by undermining his professional standing.

d.      Defaming Plaintiff by publicly stating that Plaintiff was not ready to lead and or supervise the shift.

e.      Defendants knew that this would cause Plaintiff intentional infliction of emotional distress, extreme embarrassment, economic reprisal, and irreparable harms.

f.      Defendants knew that its actions were reckless, willful, intentional, deliberate, and wanton.

g.      Defendants conduct was extreme and outrageous.

h.      Defendant also violated public policy

a.      Plaintiff and others have the Right to fair wages for work performed

iv.    Defendant intentional and willful interference of Plaintiff's job duties and obligations as lead ; Defendants undermining Plaintiff's authority as a lead.

a.    Defendant failed to enforce discipline on a non-black associate who had violated a safety policy.

b.    Defendants allowed this same non-black associate to threaten to harm Plaintiff without consequence or discipline according to company policy.

c.    Defendants required Plaintiff to engage in practices outside the best and normal practices of Defendant when Plaintiff reported being threatened.

d.    Defendant required Plaintiff to provide witness to Defendant.

e.    Defendant still intentionally, willfully and wanton recklessly failed to investigate Plaintiff's claims.

f.    Plaintiff continued to be threatened by this associate.

g.    Defendant has a written policy with regards to:

a.    Harassment

b.    Workplace violence ( zero tolerance )

c.    Ethics and Conduct

d.    General Employment policy

h.     Defendant also violated public policy

    a.     Right to be free from discrimination and harassment of all types;

    b.     Right to a safe workplace free of dangerous conditions, toxic substances, and other potential safety hazards;

    c.     Right to be free from retaliation for filing a claim or complaint against an employer

i.     Defendants actions fostered and inflamed the already hostile, racially charged and animus work environment.

    a.     Defendants intentional and willful actions jeopardized the safety and well-being of Plaintiff and others at the Mars Manteno facility.

    b.     Defendant failed to follow its own policies and mandates.

    c.     Defendants actions were reckless, willful, intentional, deliberate, and wanton.

    d.     Defendants conduct was extreme and outrageous.

    e.     Defendant also violated public policy when it failed to:

        a.     Provide Plaintiff and others the right to be free from discrimination and harassment of all types;

        b.     Provide Plaintiff and others the right to a safe workplace free of dangerous conditions, toxic substances, and other potential safety hazards;

    c.  Provide Plaintiff and others the right to be free from retaliation for filing a claim or complaint against an employer

j.  Defendant denied Plaintiff access to the office where the other leads were similarly situated

k.  Defendant denied Plaintiff access to email whereas the other leads were similarly situated had access to their email.

l.  Defendant effectively demoted Plaintiff from a lead associate by denying Plaintiff access to the office, to his email, and assigning other duties to Plaintiff other than those of a lead associate.

  a. Defendant KENCO intentionally and willfully interfered with the job duties and obligations of Plaintiff as the Lead associate in the opposition of disparate and disparaging treatment and impact of employees, especially African American's and those who opposed such.

  b. Defendant's actions were rooted in racial animus amongst other drivers.

m.  Defendants intentional, deliberate and willful interference with the intent to obstruct justice.

**192.** Plaintiff also alleges and believes that Defendant committed obstruction by destruction of evidence.

a.      Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file to impede the administration of justice at the Illinois Department of Human Rights, Illinois Department of Labor and EEOC, as well as, the pending judicial proceedings that would make Plaintiff whole.

193.      Plaintiff also alleges and believes that Defendant committed obstruction of justice by destruction of evidence.

a.      Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, as well as, statements of account on Plaintiff' behalf to obstruct the administration of justice at the Illinois Department of Human Rights, Illinois Department of Labor and EEOC, as well as, the pending judicial proceedings that would make Plaintiff whole.

194.      Plaintiff also alleges and believes that Defendant committed obstruction of investigations by destruction of evidence.

a.      Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, inclusive of the investigation file and other relevant parts of Plaintiff' file commensurate to the company's  to personnel file keeping policies and practices, to impede the administration of justice at the

EEOC, as well as, the pending judicial proceedings that would make Plaintiff whole.

i.    Defendant materially altered the personnel files of employees who have waged claims against defendant.

a.   Defendant has not maintained personnel files according to company policy

b.   Defendant has not maintained personnel files according to the requisites of the Food Drug & Cosmetic Act and The Food Safety and Modernization Act effectuated through Defendants implemented Quality Management System based upon ISO 9001:2008 standards.

c.   Personnel files presented by Defendant do not mirror the files that Plaintiff and Szplett oversaw at the Mars Manteno facility.

d.   Defendant removed documents from these personnel files

e.   Defendant added documents to these personnel files

195.   Plaintiff also alleges and believes that Defendant committed obstruction of an administrative proceeding.

a.    Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, as well as, supplying misleading witnesses, information and documentation, including, but not limited: the verified response and position statements, as well as, company policies, procedures and the like, to impede the administration of justice at the Illinois Department of Human

Rights and EEOC, as well as, the pending judicial proceedings that would make Plaintiff whole.

196. Plaintiff also alleges and believes that Defendant committed perjury.

     a.    Defendant knowingly and willingly and contrary to oath engaged in unlawful conduct by deliberately supplying misleading witnesses, witnesses without firsthand information, false statements, verifications, position statements and documentation as material facts to impede the administration of justice at the Illinois Department of Human Rights and Employment Security and EEOC, as well as, the pending judicial proceedings under oath, as well as, verification, and certification that would make Plaintiff whole.

For example:

    Defendant's verified response and position statements.

197. In October or November 2014, Jay Elliott and several unknown "Kenco Co-Conspirators" engaged in the contrived scheme to hire Jay Elliott as Vice President of Legal.

198. Upon information and belief this scheme was contrived to avoid culpability and liability of the company.

**199.**    The true names and capacities of the defendants named herein as "Kenco Co-Conspirators" are unknown to Plaintiff, who therefore sues them under these fictitious names.

**200.**    Plaintiff will amend this complaint to add their true names and capacities when they become known.

**201.**    The plaintiff then alleges that all of the defendants (presumably including the "Kenco Co-Conspirators" defendants) were the agents and principals of all of the other defendants and were acting in the course and scope of their authority when they hired Jay Elliott.

**202.**    According to Kenco Company Exempt Hiring Policy CP-HR-1002:

> **Executive Management** — perform approval authority duties for job openings and responsible for nominating candidates for Vice President levels and above.
>
> **CFO** — performs approval authority duties as described in this procedure
>
> **Kenco Management Services (KMS) — Director of Recruiting and Development** — performs approval authority duties throughout the exempt hiring process and responsible for the overall implementation and enforcement of this policy for the company.
>
> **KMS — Human Resources (HR) Recruiting Assistant** — performs duties outlined in this procedure to assure sites are notified of exempt job openings and that the exempt hiring process is followed through successful placement of a candidate.
>
> **KMS — Human Resources Employee Relations (ER) Administrative Assistant** — enters all exempt level background investigations into the company approved vendor's system.
>
> VP level and above positions will not be posted through the internal process. Those positions will be filled through nominations by VPs or above to be submitted to the Group President and CFO for final approval.
>
> Posting Process

a.   The Hiring Manager will complete form *CP-HR-6.2.2.013-1 Exempt Job Posting Requisition Form,* obtain the required signatures, and submit the completed form along with a current job description to the HR Recruiting Assistant. Postings for both replacement and newly created positions must be approved by the Hiring Manager's immediate Supervisor/Manager, the Director or VP of Operations, and the CFO.

i.        All exempt job postings will be posted by the 2nd business day after the HR Recruiting Assistant receives the required documents.

For example: Job posting requests received by 5:00 p.m. on Monday will be posted by 5:00 p.m. on Wednesday of the same week; Job posting requests received by 5:00 p.m. on Wednesday will be posted by 5:00 p.m. on Friday of the same week.

Pending successful completion of the background check (external candidates only, except in Canada), the Hiring Manager will complete *CP-HR-1002-4 Offer Letter Summary Form* and send it to the HR Recruiting Assistant.

Pending successful completion of the background check (except in Canada), the HR Recruiting Assistant Prepares the Offer Letter and emails to the Hiring Manager including the *Relocation Expense Repayment Agreement* (if applicable). The Hiring Manager will sign and extend the finalized Offer Letter to the selected candidate

Upon receipt of the signed Offer Letter and Relocation Expense Repayment Agreement, the HR Recruiting Assistant will obtain the final approval of the Director of Recruiting and Development.

The HR Recruiting Assistant will forward the signed Offer Letter to the appropriate KMS-HR Payroll Supervisor via a flagged email.

All new employees must complete their part of the new hire paperwork through the HRIS Onboarding Program before end of business on their first day of work with Kenco.

a. In Canada, all new hire paperwork must be completed by end of business on the first day of work.

All employer-related new hire paperwork must be completed by the Site HR Adminstrator associate through the HRIS Onboarding Program within the first three (3) days of employment.

203.    Plaintiff also alleges and believes that Defendant committed a conspiracy to obstruct

and commit fraud against the court.

a.      Elliott stated to the Illinois Department of Human Rights and EEOC on or about January 7, 2015 that he was representing Defendant.

a.      Defendant was informed with every filed charged that charges were cross filed with the IDHR and EEOC.

b.      Defendant was informed of the EEEOC's recordkeeping and reporting requirements.

c.      Defendant was also informed the participation requirements for participating in a Fact Finding Conference.

d.      Defendant knew that there were onsite personnel with first-hand knowledge.

e.      Defendant knew it gathered its information from the onsite personnel. Some examples are:

a.      Defendant knowingly and willingly postulated its Vice President of Legal as an individual who had firsthand knowledge of the material facts and/or matters relating to Plaintiff and others by allowing him to be a participant in the Fact Finding Conferences for the Illinois Department of Human Rights and EEOC investigation, being a precursor to an obstruction of the Federal Court.

b.      Defendant knew that it had an admitted history to the court of a pattern and practice of disparate and disparaging treatment and impact towards African Americans; specifically Jay Elliott informed the court of such in Brown vs. Kenco. {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

c.    Defendant knew it had in excess of 30 discrimination charges filed against Defendant at the Mars Manteno Facility.

d.    Defendant knew that these and other infractions, if found liable, would be a breach of contract with MARS, Inc.

e.    Defendant knew it was truth to the charges filed.

f.    Defendant knew it had violated a number or public policies.

g.    Defendant crafted and contrived a plan to employ Jay Elliott as an employee of Defendant.   Jay Elliott aided and abetted Defendants.

h.    As a matter or ordinary course of business Defendant Kenco and Elliott discussed Elliott's employment expectations, goals and the like.

i.    Defendant and Elliott agreed upon terms and conditions of Elliott's employment, including wages, benefits, goals and the like.

j.    Defendant and Elliott knew that Elliott's employment would circumvent Illinois Department of Human Rights and EEOC guidelines.

k.      Defendant knew it would impede the exhaustive remedy process to the administration of justice.

l.      Defendant knew Elliott was a licensed and practicing attorney in the state of Tennessee

m.      Defendant knew that it had retained Elliott as outside counsel in other employment related matters.  {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

n.      Defendant had a well-established relationship with Elliott, Karen Smith and Miller & Martin PLLC.  {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

o.      Defendant knew Elliott was not hired until after the incidents occurred relative to Plaintiff and others.

p.      Defendant knew that Lori Varvel was not hired as the dedicated Human Resource Manager until after the incidents occurred relative to Plaintiff in November of 2014.

q.      Defendant knew that Elliott was not physically situated at the Mars Manteno facility.

r.      Defendant knew that Jay Elliott and others such as Tammi Fowler, Senior Manager of Employee Relations, were in Chattanooga, Tennessee and could not have been a party to the incidents in question.

s.      Defendant knew that it could conspire with its employees and not be subject to conspiracy.

t.      Defendant knew that as an attorney Elliott would not be allowed to be an active participant in the Illinois Department of Human Rights and EEOC investigations.

u.      Defendant knew that it had terminated some of the agitators and provocateurs of the allegations set forth by Plaintiff and others.

v.      Defendant knew that it did not have supporting witnesses to incidents.

w.      Defendant reported to Illinois Department of Human Rights and EEOC that it no longer had its witnesses.

x.      Defendant knew that the incidents with Plaintiff and others had been contrived and/or valuated differently than those committed by similarly situated non-blacks or those who did not oppose such disparate and disparaging treatment and impact upon African-Americans.

y.      Defendant knew that it had ostracized its onsite Human Resource Personnel from formal investigations and the like.

z.      Defendant knew it had undermined its onsite Human Resource Personnel from performing their charged duties at the Mars Manteno facility.

aa.     Defendant knew that the onsite Human Resource Personnel had reported the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment to management and Kenco Corporate office.

bb.     Defendant knew that the onsite Human Resource Personnel had opposed the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment.

cc.     Defendant knew that it had misrepresented the onsite Human Resource Personnel stance on the reporting of the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment to the Illinois Department of Human Rights and EEOC.

dd.     Defendant knew that it deviated from its organizational structure at the Mars Manteno Facility.

ee.     Defendant knew that Elliott had no firsthand knowledge.

ff.     Defendant knew that they had not taken reasonable steps to correct the hostile and animus work environment for Plaintiff and others.

gg.     Defendant knew it did not follow its own policies and procedures.

hh.     Defendant knew that the Illinois Department of Human Rights and EEOC would assume that Elliott and others were legitimate employees of Defendant.

ii.     Defendant knew that employing Elliott would give him a legitimate reason to be a party to Defendant's administrative proceedings.

jj.     Defendant knew that the Illinois Department of Human Rights and EEOC would rely on the information provided by Elliott to make an administrative determination.

kk.    Defendant knew that Elliott would have an unfair advantage over Henry and others, as an Expert in Law and Subject Matter Expert in employment Law.

ll.    Defendant knew that Elliott would be able to mitigate any statements of fact made by Plaintiff's because of his expertise and knowledge.

mm.    Defendant knew that Elliott would be able to use his expert knowledge to aid and abet Defendant in the violation of Henry and others protected rights by deception, conspiracy, manipulation of material facts to Defendant's advantage, presenting materially false and misleading documentation and statements to the Illinois Department of Human Rights and EEOC, impede and obstruct the administration of justice, commit fraud on the court, perjury and a number of unconscionable contrived schemes.

nn.    Defendant knew it was evading the law and circumventing justice.

oo.    Defendant knew that evading the law and circumventing justice at the IDHR and EEOC was a precursor to the obstruction of pending federal court proceedings.

pp.    Defendant knew its beahviour's toward the employees of the Mars Manteno, as well as, the administration of justice were/are unlawful, disingenuous, and contrived.

qq.    Defendant knew that assault was a criminal offense and punishable as such.

rr.    Defendant knew that it aided and abetted the violators of company and public policy that included but was not limited to Mars Manteno employees and Kenco Corporate employees.

ss.    Defendant knew that it had discriminated against Plaintiff.

tt.    Defendant knew it minimalized its actions.

uu.    Defendant's hedged on prevailing at the IDHR and EEOC

vv.    Defendant knew this would cause irreparable harm to Plaintiff and others.

ww.    Defendant knew that providing misleading, deceptive, disingenuous statements and documents would make it more encumbering and difficult for Plaintiff and others to prevail.

    i.    Defendant knew it hired and promoted Stephanie Dumas against and in violation of its own policies.

    ii.    Defendant knew that it intentionally created a racial, animus and hostile work environment for Plaintiff and others.

    iii.    Defendant knew it had retaliated against Plaintiff by suspending him, denying him overtime and equal terms and conditions of employment and writing him up.

ww.    Defendant also conspired with Mars Manteno employees, such as, but not limited to: Kelvin Walsh, Mike Manzello, Mario Lopez and Stacey Bushey

**204.**    Plaintiff also alleges and believes that Defendant committed obstruction by mail.

a.    Defendant knowingly and willingly used the United States Mail to further its scheme of fraud by mailing Plaintiff's altered personnel file, as well as, supplying misleading witnesses, information and documentation to impede the

administration of justice at the Illinois Department of Human Rights and EEOC, as well as, the pending judicial proceedings that would make Plaintiff whole.

For example:

> 1.  Mailing to the IDHR and EEOC non-effectuated and irrelevant policies.
>
> 2.  Mailing to the IDHR and EEOC verified responses and positions statements under oath and/or perjury that contained deceptive, fraudulent, misleading and disingenuous information that reference policies and procedures that were not relevant to Plaintiff to commit fraud against the administration of justice and Plaintiff.

205.    As an officer of the court and subject matter experts Defendant and Defendants agents knew better.

206.    Plaintiff also believes that Defendants intentionally and willfully interfered on a number levels and instances by persons known and unknown to Plaintiff to avoid culpability for the actions of Mars-Kenco and its agents in the creation and sustainment of a racially charged, motivated and animus atmosphere that fostered hate crimes, threats, disparate and disparaging impact and treatment to those who oppose such treatment;

207.    Defendant changed policies, procedures, protocols and the like to support Defendant's current stance to various regulatory agencies, including but not limited to: OSHA, IDHR and EOC.

208.    Defendant intentionally, blatantly, woefully, recklessly and willfully failing to adhere to its policies, procedures and protocols, as well as, public policy

209.    Defendant conspiring and contriving schemes to legitimize adverse employment actions, up to and including termination.

210.    Defendants intentionally and willfully contriving a scheme hiring Jay Elliott as VP of Legal.

211.    Defendants postulating Jay Elliott as having firsthand knowledge of the matters that were before the IDHR and EEOC relating to Plaintiff and others..

212.    Defendants postulating Jay Elliott as having firsthand knowledge and being a witness to the matters that were before the IDHR and EEOC relating to Plaintiff and others.

213.    Defendant's Jay Elliott filing an appearance as legal counsel before the IDHR and EEOC as legal counsel for the Defendant.

214.    Defendants intentionally, willfully and woefully failed to investigate documented claims of racially charged and motivated instances and hate crimes by Plaintiff and others.

215.    Plaintiff also believes that Defendant also intentionally and willfully interfered with his right to enjoy his protected rights of a fair due process of law.

216.    Plaintiff also believes that Elliott help conspire to further Defendant's scheme by aiding and abetting Defendants.

217.    Defendants intentional and willful interference and blatant disregard of the obligations to the law to prevent its employees, agents and the like from open and blatant discrimination, as well as, the creation and sustainment of a hostile, animus , and racially charged atmosphere.

218.    Defendants intentional and willful interference and blatant disregard of the obligations to the law to mitigate and uphold opposition to the impeding and obstruction of justice to governmental regulatory agencies, such as but not limited to the Department of Human Rights, EEOC and OSHA.

219.    On or about December 2013-to date, Kelvin Walsh, David Jabaley, Tammi Fowler, Dan Dey, Mario Lopez, Mike Manzello, Paula Hise, Jay Elliott, Robert Coffey, MARS, Inc., and Kenco Corporate and its Executive Officers, including but not limited to: Trace Spear and other unknown individuals who willfully conspired against the violation of my constitutional rights to oppose disparate and disparaging :treatment, as well as, to not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being treated the same, afforded the same rights and privileges, as similarly situated whites:

- Performing the job duties and descriptions of a lead.

- Being paid as those similarly situated whites performing the job duties and descriptions of a lead.

- Access to overtime as other similarly situated whites performing the job duties and descriptions of a lead.

- Access to premium shifts as other similarly situated whites performing the job duties and descriptions of a lead, such as but not limited to Stephanie Dumas.

- Who were not subjected to unequal terms and conditions of employment.

- Performing the job duties and descriptions of a lead were trained in accordance to Mars Kenco requisites for execution of the warehouse management system Red Prairie.

- Who were not ostracized from the necessary training in order to adequately perform the job duties and functions of a lead.

- Who were afforded the fringe benefits and privileges of being a Mars Kenco employee.

- Who were not retaliated against by Defendant for: filing internal and external complaints; complaining about disparate and disparaging treatment and impact, complaining about disparate pay, complaining about the hostile, racially charged and animus atmosphere; being out on FMLA and being disabled amongst other things.

- Who did not have corporate interference with their employment opportunities.

- Who did not have Defendant Kenco's Senior Corporate Employee Relations Manager, Tammi Fowler, effectively deny Plaintiff overtime and other fringe benefits.

- Who did not have Defendant Kenco's Senior Corporate Employee Relations Manager, Tammi Fowler, conspire with Mars Manteno General Manager, Kelvin Walsh, discriminate against Plaintiff by paying Plaintiff less than other leads, as well as, prorate Plaintiff's pay as a lead at the time of promotion.

- Performing the job duties and descriptions of a lead were paid the prevailing rate.

- Performing the job duties and descriptions of a lead pay was not prorated.

- Who had received the benefit of Defendants policies, procedures, and protocols as it relates to employee relations and other matters of best practices, equity and the like.

a.  Unbiased investigation and the fair and equitable administration of company policy.

   i.    Plaintiff being suspended for alleged insubordination; when in fact Plaintiff's supervisor and witnesses said that it was not so.

   ii.    Plaintiff's complaints of disparate and disparaging treatment and impact that went uninvestigated.

   iii.    Other incidents that created and fostered a hostile, animus, and racially charged atmosphere such as but not limited to Stacey Bushey, non-black, who overheard a conversation amongst Dana Woods, African –American and another employee pertaining to a newsworthy event, in which she felt threatened.  Due to Bushey's perceived threat to her well-being and person, Bushey was able to initiate and facilitate Woods being suspended, without pay, for more than a week for having a mere conversation with another employee that Bushey was not a part of.

   a.  Defendant did not follow its own disciplinary policy

- Who were misled into believing that Defendant had Tammi Fowler, Dany Dey and others conduct unbiased investigations into the complaints of Plaintiff and others.

- Who were given the benefit, latitude and luxury of a progressive disciplinary process.

- Who were given the benefit, latitude and luxury of being disciplined in a humane and respectfully manner, without being publicly confronted, reprimanded and humiliated.

- Who were given the benefit, latitude and luxury of not being scrutinized and or imposed harsher standards.  Such as but not limited to Pete Monstwillo. Monstwillo openly touted his white supremacy, superiority, his favorable affiliation with management and his distaste and disdain for African Americans.

Monstwillo had on a number of occasions called African Americans "niggers" and often used physical aggression towards African Americans, including Plaintiff and especially Vernon Henry another African American employee.

Monstwillo attempted to murder Henry with the extended blades of a moving forklift truck, by running him down. In continuum Monstwillo got off his forklift and became more physically aggressive and threatening towards Henry immediately and throughout the night.

Defendant did not follow any of its policies, procedures, and protocols. Defendant has a zero –tolerance policy with regards to work place violence. Monstwillo was not punished and if Monstwillo was punished it was not as severe, harsh or as swift as the punishment administered to African Americans.

Defendant, specifically Fowler, minimized Monstwillo's actions and said he was just horse playing, with a 9,000 pound moving vehicle, when he tried to kill Henry. Defendant made this statement to the IDHR and EEOC. This stance was diametrically opposed to the one that it took with Woods, who was just merely having a conversation about a newsworthy event and got suspended, as well as, the position it took with Henry in terminating him for an alleged violation of a cell phone policy without an investigation.

a. Defendant disparately picked and chose who and when a policy would be implemented upon.

b. Defendant did not administer policies, procedures, Opportunities For Improvement and punishments equitably between non-African Americans and African-Americans.

c. Defendant subjected African-Americans to harsher scrutiny, punishment and adverse actions than non-African-Americans.

d. Defendant failed to even punish non-African Americans for more egregious and life threatening documented occurrences.

e.    Tammi Fowler was again responsible for administering another

adverse employment decision of another African American

220.    Defendant KENCO and its agents, Fowler, Dey, Walsh, Jabaley, Lopez, Lillie, and

others, publicly humiliate, degrade, belittle, intimidate and reprimand employees, especially

African American's and those who oppose disparate and disparaging treatment.

221.    Defendants' actions were racially motivated and inspired.

222.    Defendants' continued to employ employees who denigrated African-American

employees, as well as, openly bigoted and racist employees.

223.    Defendant Kenco and its agents, on an ongoing and regular basis, made

intentional and willful adverse decision to continue to subjugate African Americans,

including Plaintiff, and those who opposed disparate and disparaging treatment and

impact, to contrived plans of harassment and intimidation in retaliation of waging

internal and external complaints of, nepotism, favoritism, racism, discrimination,

intimidation, hostile work environment, harassment, coercion, harder work

assignments, less pay, humiliation, harsher scrutiny and discipline than non-blacks

and those who did not oppose such treatment

224.    Defendant Kenco and its agents intentionally and willfully mischaracterized incidents and events with the intent to incite divisive, chaotic and racially tense relationships amongst employees and management.

225.    Defendant Kenco and its agents intentionally and willfully propagated misleading, unethical, and fraudulent company policies, protocols, procedures, and practices that were negative, adverse to, and retaliatory towards the employees, especially, African Americans, and those who oppose disparate and disparaging treatment and impact.

226.    Defendants again breached their fiduciary obligation to its employees

a.    Defendant Kenco fraudulently propagated a confidential employee hotline to report various employment issues.

   i.    Defendants KENCO intentionally and willfully induced and mislead employees into using a non-confidential employee hotline.

   ii.    The ill-gotten information was given to Fowler, who in turn gave it to Defendant's KENCO's managers and/or supervisors.

   iii.    Allegedly confidential information reported was used by Defendant KENCO and its agents to harass, intimidate, and retaliate against complaining employees

   iv.    Again fostering and maintaining an animus and hostile work environment.

b.      Defendant KENCO falsely propagated that it would follow company and public policy as it relates to employment matters.

      i.      Defendant KENCO intentionally and willfully failed to investigate reported employment matters.

      ii.     Defendant KENCO intentionally and willfully failed to fairly and unbiasedly investigate reported employment matters and concerns.

      iii.    Defendant KENCO intentionally and willfully failed to fairly and unbiasedly consider all relevant information and facts before implementing adverse employment decisions.

      iv.     Defendant KENCO intentionally and willfully failed to implement and deploy corrective and preventive actions under company and public policy.

c.      Defendant KENCO intentionally and willfully failed to fairly and unbiasedly administer the same criterion for the compensation management of non-blacks and blacks.

d.      Defendant KENCO intentionally and willfully failed to fairly and unbiasedly administer company and public policy as it relates to employment life cycle of an employee.

e.      Defendant KENCO intentionally and willfully failed to fairly and unbiasedly administer the same criterion for the hiring non-blacks and blacks.

    1.      Non-qualified non-blacks hired over qualified blacks

    a.    External non-black candidates hired opposed to internal

        qualified blacks

2.    Hiring of non-blacks with criminal backgrounds while failing to hire blacks with similar or less offenses

3.    Not vetting non-blacks prior to working as required by company and public policy.

    a.  Defendant KENCO intentionally and willfully failed to fairly and unbiasedly administer the same criterion used for the terms and conditions of employment as it relates to non-blacks and blacks.

1. Premium shift assignments

2. 40 hour work weeks

3. Overtime

4. Shift changes/cancellation

5. Training

6. Job growth and advancement

7. Job assignments

8. Discipline

9. Scrutiny

10. Recruitment

11. Onboarding

12. Compensation Management

13. Statutory Compliance

14. Assimilation and Separation

227.    Defendant intentionally and willfully submitted false, misleading and fraudulent information that subjugated employees to continual retaliation and harassment through the obstruction and impediment of entitled benefits; such as, but not limited to: FMLA, unemployment, disability, and Paid Time Off.

228.    Defendant intentionally and willfully submitted false, misleading and fraudulent information to regulatory and public policy agencies; such as, but not limited to Illinois Department of Human Rights, Illinois Department of Labor, Illinois Department of Employment Security, Department of Labor-OSHA, EEOC, FDA and others.

229.    Defendant intentionally, willfully, maliciously and recklessly depicted each and every African-American or those who opposed disparate and disparaging treatment of African-Americans as either an offender of public and company policies, procedures, protocols and the like, obtrusive, inept, low capacity, low functioning, violent, aggressive, stereotypical, incompetent, unteachable, confrontational, along with a vicissitude of allegorical degradative expressions.

230.    Plaintiff believes that Lillie conspired and aided and abetted Defendants in avoiding culpability by assisting them in the development of fraudulent policies, procedures, and forms.

**231.**    Defendants allowed its employees and management to make racial slurs, epithets, threats, and stereotypes, such as, but not limited to: referring to African Americans as "Niggers", "Black Bitch", "Black Ass" and the like at the Mars Manteno facility without reprisal.

**232.**    On or about late September 2014 to date, David Jabaley, Melissa Hansen, Mario Lopez, Valerie Lillie, Tamrni Fowler, and Lori-Varvel, Jay Elliott and others willfully conspired against the violation of my constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being free from a hostile work environment, harassment, nepotism; favoritism, racism, retaliation, being subjugated to harsher scrutiny, discipline and more strenuous work assignments, less opportunities, and less hours afforded to be worked.

**233.**    On or about September 2014 Hansen, the newly promoted Operations Manager, stopped Plaintiff's overtime.

**234.**    Hansen refused to give Plaintiff overtime.

**235.**    Other similarly situated whites including leads and other warehouse workers were afforded overtime.

**236.**    Hansen reported to Lopez.

237.    Hansen managed the Operations of the Mars Manteno facility.

238.    Lopez and Jabaley oversaw the day-to day work flow and matrices of the Mars Manteno facility.

239.    Pete Monstwillo and others were afforded premium shifts and overtime.

240.    Defendant had a business necessity to support overtime based upon the directives from Mars.

241.    Defendants had mandated overtime for the employees.

242.    Defendant had signup sheets for voluntary overtime.

243.    Plaintiff duties as a lead were altered as Plaintiff would be given more strenuous work assignments than other leads.  Such as but not limited to working in the cold room, which was below forty (40) degrees, working at dock doors that were unsafe, slippery and wet amongst other assignments.

    a.  Defendant KENCO intentionally and willfully interfered with the job
        duties and obligations of Plaintiff as the Lead associate in retaliation
        and in opposition of disparate and disparaging treatment and impact

of employees, especially African American's and those who opposed such.

    b.  Defendant's actions were rooted in racial animus amongst other drivers.

244.    On or about November 10, 2014 Mario Lopez, Melissa Hansen, Dustin Spaulding, and Russell Shippits willfully conspired against the violation of Plaintiff's constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being free from a hostile work environment, harassment, nepotism, favoritism, racism, retaliation, being subjugated to harsher scrutiny and more strenuous work assignments by contriving that I had failed to execute the proper procedure and protocol for interleaving despite the supervisor having full knowledge of the plan, as well as, being told that I did not like following directions, when in fact no directions were given.

245.    On or about November 16, 2014, Mario Lopez and Melissa Hansen willfully and intentionally conspired against my constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being free from a hostile work environment, harassment, humiliation, nepotism, favoritism, racism, retaliation, being subjugated to harsher scrutiny and more strenuous work assignments by having Stacey Bushey and Russ Schippits give me a reprimand of a verbal/written Opportunity for Improvement verbal/write up in the break room in front of other employees.

**246.**    On or about November 16, 2014, Russell Schippits willfully and intentionally conspired against my constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being free from a hostile work environment, harassment, humiliation, nepotism, favoritism, racism, retaliation, being subjugated to harsher scrutiny and more strenuous work assignments by physically intimidating and coercing Plaintiff into signing the verbal/written (reprimand) Opportunity for Improvement Form that stated through "Carelessness or inefficient performance of job duties, including the failure to maintain proper standards of performance or interfering with the work of other employees."

**247.**    Beginning on or about December 2013 to November 16, 2014, on an ongoing and regular basis coercion occurred when Kelvin Walsh forced Plaintiff to take a position paying less money than the white counterparts in order to obtain the position. After complaining of such, Plaintiff was coerced into taking a supposed reasonable suspicion drug test by Valerie Lillie and Mike Manezello because Plaintiff supposedly smelled like "weed." The protocol followed really turned out to be a drug and alcohol test for an on the job accident and Plaintiff was told that if Plaintiff refused Plaintiff would be terminated, even though it was Plaintiff's day off.

**248.**    Plaintiff was also coerced into using his PTO time to make up for being afforded less hours to work than Plaintiff's white counterparts, after making internal and external complaints about the disparate and disparaging treatment and impact, as well as, complaining about the shift Plaintiff was to run on the weekend that kept getting cancelled without proper notice.

249.    Plaintiff was coerced by David Jabaley and Tammi Fowler into signing an Opportunity for

Improvement Form as a condition of returning to work after an unlawful suspension and without

being apprised of the protocol for the investigation and the outcome of the investigation;

whereby Plaintiff was allegedly insubordinate, despite my supervisor stating that was not the

case.

> a.  Defendant intentionally and willfully spoiled direct evidence
>     submitted from investigations, complaints and the like
>     gathered by Plaintiff, Szplett and others that could be used to
>     support the position of employees/claimants.

250.    Plaintiff was coerced and physically intimidated by Russell Shippets to sign another

contrived Opportunity for Improvement form because of alleged Carelessness or inefficient

performance of job duties, including the failure to maintain proper standards of performance or

interfering with the work of other employees." When in fact this information had not been

communicated to Plaintiff or his supervisor.

251.    Plaintiff later learned after the termination of his employment that the Opportunity For

Improvement that Plaintiff was forced to sign was later voided in his personnel file.  Defendant did

not inform Plaintiff of the voiding of this disciplinary action nor the reason why.

252.    Plaintiff was also intimidated and coerced into being continually subjugated to the disparate and disparaging treatment and impact, as a term and condition of his employment, of a hostile, racially animus and charged environment because:

- Defendant would not follow company or public policy

- Defendant did not investigate Plaintiff's claims

- Defendants ongoing evasion and obstruction of justice

- Defendant continued to place Plaintiff in a posture of fear and duress as it related to the loss of Plaintiff's job and the adverse well-being of Plaintiff's family.

- Defendant's Vice President, Paula Hise, lauded, condoned and called Kelvin Walsh a ring leader and initiator of these disparate and disparaging acts, a valued employee, a great asset, friend of the company, in which they hated to lose him, when he was transitioning out.

253.    Plaintiff also believes that his rights were deprived under 42 U.S.C. §1983.

254.    Upon information and belief Plaintiff believes that the Illinois Department of Human Rights, herein referred to the "department" and its investigators acted in concert with Defendants to engage in a course of action that would deprive the plaintiff of his constitutional rights.

255.    The true names and capacities of the defendants named herein as "IDHR Staff" are unknown to Plaintiff, who therefore sues them under these fictitious names.

**256.**    Plaintiff will amend this complaint to add their true names and capacities when they become known.

**257.**    The plaintiff then alleges that all of the defendants (presumably including the "IDHR Staff" defendants) were the agents and principals of all of the other defendants and were acting in the course and scope of their authority.

**258.**    The Illinois Department of Human Rights allowed Defendant to further it schemes by allowing the Defendant to engage in the investigatory process; despite the defendant admitting that it had no witness.

**259.**    The Illinois Department of Human Rights allowed Jay Elliott to be the Attorney for the Defendant, as well as, the witness in Doss, Tyson and other complainant's cases before the department.

**260.**    The "department' states in correspondence in a matter of course of ordinary business that attorneys will not be allowed to engage on behalf of any party.

**261.**    The "department' states in correspondence in a matter of course of ordinary business that a failure to participate in the proceedings can constitute a default.

**262.**    Defendant admitted to the "department" on numerous occasions that it had no witnesses, as it lost its contract and no longer had access to its former employees.

263.    Plaintiff and others believe that there had to be a concerted meeting of the minds between Defendant and the "department" to allow Defendant to operate outside the authority granted to the "department" by law.

264.    Jay Elliott was hired by the defendant after the relevant time to Plaintiff and other complainant's charges before the "department."

265.    Jay Elliott filed an appearance on behalf of Kenco in several matters at The Illinois Department of Human Rights.

266.    Jay Elliott, and David Jabaley attended and participated as witnesses in the Plaintiff Fact Finding Conferences.

267.    Prior to and during the various Fact Finding Conferences, Plaintiff's legal counsel raised the issue of Elliott's and Jabaley's participation as witnesses relating to the allegations outside their scope of employment to Detwiler, the Chief legal Counsel and the OEIG.

268.    Upon information and belief Defendant Kenco had a General Counsel, Ann Christopher.

269.    Upon information and belief Defendant Kenco had no legal department that existed.

270.    Upon information and belief Defendant Kenco's Legal department was not created until Jay Elliott was hired in November of 2014.

271.    Upon information and belief Defendant Kenco hired Elliott as part of a conspired and contrived scheme to help Defendant evade and obstruct justice and culpability.

272.    Plaintiff's attorney or attorney representative was not allowed to participate in the Fact Finding Conference.

273.    Upon information and belief, this was not the first time that this issue had been raised with The Illinois Department of Human Rights and specifically with Investigator Detwiler relative to Jay Elliott's employment relationship with the defendant.

274.    Upon information and belief, as early as, as late winter and/or the beginning of spring of 2015, The Illinois Department of Human Rights had been made apprised of various Defendant's employment relationships and tenures, including Elliott.

275.    At the same time, The Illinois Department of Human Right was also presented with other documentation from other witnesses LinkedIn pages confirming either their employment dates and or physical location.

276.    The Illinois Department of Human Rights allowed others such as Elliott, Varvel and Jabaley to be witnesses on behalf of the defendant without having firsthand knowledge of Plaintiff and other complainant's cases before the department.

277.    The Illinois Department of Human Rights had been made apprised of similar and/or same instances of either persons being used as witnesses by defendant that had no information and/or firsthand knowledge or who were not employed by defendant during the relevant times of the various Plaintiffs' instances, as well as, other various matters of concern.

**278.**    Upon information and belief, beginning in April of 2015, the Director of The Illinois Department of Human Rights "IDHR Staff" was contacted and made apprised of these matters.

**279.**    Upon information and belief, in May of 2015, the Chief Legal Counsel for The Illinois Department of Human Rights "IDHR Staff" was contacted and made apprised of these and other matters.

**280.**    Upon information and belief, simultaneously, complaints were filed with the OEIG regarding the behavior of The Illinois Department of Human Rights with regard to the defendant.

**281.**    Upon information and belief, in July of 2015, Acting Executive Inspector General of Illinois was contacted requesting an investigation into the matters at hand between The Illinois Department of Human Rights and defendant.

**282.**    Upon information and belief, the Office of the Executive Inspector General, herein referred to as the "OEIG" took the position that this was an internal issue at The Illinois Department of Human Rights and that they should address the issues at hand.

**283.**    Upon information and belief, in September of 2015 the Charge Processing Division Manager of the "department" "IDHR Staff" was contacted regarding the issues at hand.

**284.**    Upon information and belief, nearly every level and functionality of the "department" were made apprised of the various issues at hand.

285.    This concerted behavior between the "department" and the defendant led to Plaintiff and the other complainants receiving findings of Lack of Substantial evidence; despite the "department" being presented with direct conflicting information to Defendant's position or statement specifically from Defendant's: website, employee LinkedIn pages, business records, policies, procedures and the like.

286.    Plaintiff and his attorney, as well as, others and their attorney were not allowed to cross examine the witnesses during the fact finding conference and were not even allowed to participate when the investigator interviewed witnesses by the telephone or in person.

287.    The "department" and defendant knew that an adverse finding of lack of Substantial Evidence for Plaintiff and other complainants would cause Plaintiff and others irreparable harm, increased emotional and physical stress, duress, cost and continued financial burdens.

288.    Upon information and belief, the 'department's" protocol is that the investigator completes the investigation, the supervisor reviews the work and the work is presented to legal.

289.    Upon information and belief the 'department" internally cross-referenced the charges filed by complainants against Defendant including, Plaintiff's.

290.    Plaintiff and others believe that the department was apprised of the numerous charges filed by more than 20 persons against defendants.

291.    Any reasonable person would have concluded that there was an issue with defendant, especially if more than 20% of the workforce filed complaints.

292.    Plaintiff and others believe that the "department" and its staff did not uphold their fiduciary obligations.

293.    Plaintiff and others believe that the "department's" depraved contrary custom and blatant disregard for public policy encouraged Defendant to further it schemes without reprisal.

294.    Plaintiff and others believe that the "department" aided and abetted Defendants in the violation of Plaintiff and others protected rights.

295.    Plaintiff and others believe that the "department" was a willful participant in Defendants malicious scheme.

296.    Plaintiff and others believe that the "department" knew that not following its policies would intentionally and willfully inflict and cause emotional distress and harm, as it had been mandated amongst other things to not make credibility determinations.

297.    Plaintiff and others believe that the "department's" intentional, woeful and willful disregard of its own policies was one of the drivers in Defendant's actions that led Plaintiff's and others rights to be continual deprived by both the defendant and the "department."

298.    The "department" is under an injunction not to make credibility determinations.

299.    The "department" disseminates as a matter of course of ordinary business that it is under an injunction not to make credibility determinations.

**300.**    **The Cooper v. Salazar injunction** IDHR is under a federal-court injunction that, among other things, orders IDHR: "to cease permanently from relying on credibility determinations made without affording the rights of confrontation and cross-examination". See, Cooper v. Salazar, #98 C 2930, U.S. District Court for the Northern District of Illinois, Order dated November 1, 2001, at p. 26, ¶1.

<u>Meaning of the Cooper Injunction</u>
The Department cannot assess the credibility of Complainant's testimony, the testimony of Complainant's witnesses or the testimony of Respondent's representatives or the witnesses of Respondent where there is conflicting testimony. In other words, if the determination of substantial evidence turns on issues of credibility, the Department should make a finding of substantial evidence so that a trier of fact may resolve those issues of credibility. This means that if a determination of lack of substantial evidence requires the Department to make a finding of fact as to conflicting evidence, the Department will make a finding of substantial evidence so that credibility may be resolved by the Human Rights Commission at a Public Hearing or in circuit court. The Illinois Human Rights Act defines "substantial evidence" as: "evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance". Illinois Human Rights Act §7A-102(D)(2), codified at 775 ILCS 5/7A-102(D)(2).

<u>The Meaning of Credibility</u>
IDHR is an investigatory agency. IDHR's purpose is to gather all of the evidence from each of the parties as to whether Respondent may or may not have discriminated against the Complainant within the meaning of the Illinois Human Rights Act. IDHR's purpose is to review all of the evidence and make a determination based upon the law as to whether there is sufficient evidence of discrimination to file a complaint against the Respondent with the Illinois Human Rights Commission. IDHR will not make a finding that evidence submitted by a party is either believable or not believable. Thus, IDHR will not base its findings on the fact that one of the parties is not telling the truth or that one party's evidence is not believable. If the resolution of the charge of discrimination requires believing the evidence of one party over another party, IDHR will make a finding of Substantial Evidence and refer the matter to the Illinois Human Rights Commission so that a trier of fact may resolve the case.

<u>Conflicting evidence exists when there are</u>
1. Statements of a person with material first hand knowledge contradicted by statements of a different person with material first hand knowledge.
2. Business records contradicted by oral statements of a person with material first hand knowledge.
3. Business records of one person contradicted by business records of another person

IDHR intake sheet

301.    Plaintiff and others established conflicting evidence with the "department" in regards to defendant, as well as, proffered supporting business records.

302.    The "department" made numerous credibility determinations as it relates to Plaintiff and other complainants.

303.    The "department" chose to blatantly disregard the Federal Mandates to not make credibility determinations.

304.    The "department" chose to blatantly disregard the mandates of The Illinois Human Rights Act.

305.    The "department" knowingly and willingly allowed Defendant to carry out its contrived schemes by operating out of the scope of the authority granted by law.

306.    Plaintiff and others allege and believe that the "department" knew that making credibility determinations would be an obstruction of justice and the administration of justice.

307.    Plaintiff and others allege and believe that the "department" failed to prevent the Defendants from continually conspiring against and violating the protected rights of Plaintiff and others.

308.    Plaintiff and others allege and believe that the "department" intentionally and willfully aided and abetted Defendants in continually conspiring against and violating the protected rights of Plaintiff and others, when it failed to:

    i.     Prevent Defendant from conspiring against the protected rights of Plaintiff and others.

    ii.    Prevent Defendant from continually violating the protected rights of Plaintiff and others.

    iii.   Uphold the Illinois Human Rights Act and other State Policies

    iv.   Uphold Title VII, U.S.C. 1981, 1983, and 1985, as well as, other numerous public policies.

    v.     Comply with the Federal Injunction

    vi.   Have a constitutional policy that:

        1.    Trains it employees to the standards and mandates

        2.    Embodies authorized persons to instruct its employees/subordinates to be compliant

        3.    The "department" embraces and complies to its mandates

**309.**   Upon information and belief, the "department" had at least six (6) various investigators who blatantly disregarded the Federal Injunction with regard to Defendants Kenco and Mars.

**310.**   Upon information and belief, the "department" refused to correct errors and omissions, as well as, amend charges.

**311.**   Upon information and belief, the "department" had no intention of complying with the Federal Injunction.

**312.**   Upon information and belief, the "department's" regulatory agency, "OEIG", had no intention of enforcing compliance or sanctions upon the "department."

313.     Plaintiff and others allege and believe that the "department's" regulatory agency, "OEIG", failed to prevent the Defendants from continually conspiring against and violating the protected rights of Plaintiff and others.

314.     Plaintiff and others allege and believe that the "department's" regulatory agency, "OEIG" aided and abetted Defendants in continually conspiring against and violating the protected rights of Plaintiff and others.

315.     Upon information and belief, Plaintiff and others believe that the "department" has an unconstitutional policy because either the "department" has failed to train its employees or an authorized person instructed its employees/subordinates to do otherwise or the "department" blatantly disregarded the mandates and/or a combination of such.

316.     Upon information and belief, Plaintiff and others believe that the "department's" regulatory agency, the "OEIG", also has an unconstitutional policy because either the "OEIG" has failed to train its employees or an authorized person instructed its employees/subordinates to do otherwise or the "department" blatantly disregarded the mandates and/or a combination of such.

317.     Upon information and belief, the actions of the "department" making credibility determinations deterred the majority of complainants from pursing the matter beyond the "department."

318.     Upon information and belief, the lack of actions of the "OEIG" in enforcing compliance of the IDHR also deterred complainants from pursing the matter beyond the "department."

319.    Upon information and belief, there were in excess of twenty (20) persons who filed charges at the "department" against the defendants Kenco and Mars.

320.    Upon information and belief, one complainant at the "department" Scott Marksteiner, loss his life to due to the disparate and disparaging treatment imposed upon him by Defendants for opposing the disparate and disparaging treatment of African-Americans.

321.    Upon information and belief, the "departments" actions aided defendant in continuing to subjugate Plaintiff and others to a hostile and animus work environment, as well as, adverse terms and conditions of employment, retaliation, harassment, ostracism, bullying, and other forms of disparate and disparaging treatment.

322.    Plaintiff and others believe that the "department's" actions have made a mockery of the exhaustive administrative remedy.

323.    Plaintiff and others believe that the "department's" actions have also obstructed and impeded the exhaustive administrative remedy of justice.

324.    Plaintiff and others believe that the "department's" actions were not preventative but empowering by giving Defendants a false sense of brazen security of no reprisal.

325.    Plaintiff and others believe that the "OEIG" actions also fostered Defendants false sense of brazen security of no reprisal, as it failed to prevent the "department" from conspiring, aiding,

and abetting with the Defendants, as they intentionally and willfully violated the protected rights of Plaintiff and others.

326.    Plaintiff and others believe that the "OEIG and the department's" actions also gave defendants a legitimized platform to continue to violate the protected rights of Plaintiff and others as they both were in dereliction of their respective duties.

327.    Plaintiff also believes and alleges that a violation occurred under 42 U.S.C. §1986, as Defendant Kenco did not prevent its employees and/or agents, such as, but not limited to: Tammi Fowler, David Jabaley, Jay Elliott, and Lori Varvel, as well as, "Kenco Co-Conspirators" from conspiring to violate my protected rights, as well as, others protected rights under 42 U.S.C. §1985, whether intentionally or unintentionally, because of racially motivated animus, retaliation, conspiracy, harassment and other adverse or violative drivers.

328.    Plaintiff also believes and alleges that a violation occurred under 42 U.S.C. §1986, as Defendant MARS, Inc. did not prevent its employees and/or agents, such as, but not limited to: Kenco Logistics including its employees and agents, Kelvin Walsh, Valerie Lillie and Mario Lopez, Robert Coffey. and other unknown Mars, Inc. Co-Conspirators from conspiring to violate my protected rights, as well as, others protected rights under 42 U.S.C. §1985, whether intentionally or unintentionally, because of racially motivated animus, retaliation, conspiracy, harassment and other adverse or violative drivers.

**329.**    Plaintiff also believes and alleges that a violation occurred under 42 U.S.C. §1986, as Defendant IDHR did not prevent its employees and/or agents, such as, but not limited to: John Detwiler, Charles Dunlap and other unknown IDHR Co-Conspirators from conspiring to violate my protected rights, as well as, others protected rights under 42 U.S.C. §1985, whether intentionally or unintentionally, because of racially motivated animus, retaliation, conspiracy, harassment and other adverse or violative drivers from the other Defendants Kenco Logistics, Mars, Inc., and employees and agents respectfully.

**330.**    Plaintiff also believes and alleges that a violation occurred under 42 U.S.C. §1986, as Defendant OEIG did not prevent its agency, such as, but not limited to: IDHR and its Staff, including but not limited to John Detwiler, Detwiler's Supervisor, Chief Legal Counsel, the Director, the Charge Processing Supervisor and other unknown IDHR Co-Conspirators from conspiring to violate my protected rights, as well as, others protected rights under 42 U.S.C. §1985, whether intentionally or unintentionally, because of racially motivated animus, retaliation, conspiracy, harassment and other adverse or violative drivers from the other Defendants Kenco Logistics, Mars, Inc., and employees and agents respectfully.

**331.**    The true names and capacities of the defendants named herein as "IDHR Staff and Mars, Inc. Co-Conspirators" are unknown to Plaintiff, who therefore sues them under these fictitious names.

**332.**    Plaintiff will amend this complaint to add their true names and capacities when they become known.

**333.**    The plaintiff then alleges that all of the defendants (presumably including the "IDHR Staff and Mars, Inc. Co-Conspirators" defendants) were the agents and principals of all of the other defendants and were acting in the course and scope of their authority.

**334.**    Mike Manzello confessed to Edith McCurry the HR Administrator and Plaintiff that Defendant had contrived and conspired against Plaintiff on numerous occasions, in which Manzello had participated, that would have led to the adverse employment decision to terminate Plaintiff.

**335.**    Plaintiff also believes that under **Civil Rights Act of 1866**, 42 U.S. Code §198, **42 U.S. Code §1983,** and **Family and Medical Leave Act**, 29 U.S. Code §2601, et seq. individual liability for each named defendant exists

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

To: **Nathan E. Doss**
c/o Jordan T. Hoffman, Esq.
Jordan TraVaille Hoffman, P.C.
11528 S. Halsted Street
Chicago, IL 60628

From: **Chicago District Office
500 West Madison St
Suite 2000
Chicago, IL 60661**

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 21B-2015-01282 | **Daniel Lim,**<br>**State & Local Coordinator** | **(312) 869-8082** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Julianne Bowman/ht*

**Julianne Bowman,
District Director**

October 12, 2016

*(Date Mailed)*

Enclosures(s)

cc:

**KENCO LOGISTICS SERVICES, LLC**
c/o Jay Elliott
**Vice President of Legal
2001 Riverside Drive
Chattanooga, TN 37406**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form.

#15W0407.05

| AGENCY | CHARGE NUMBER |
|---|---|
| ☒ IDHR | 2015CF2725 |
| ☐ EEOC | |

## Illinois Department of Human Rights and EEOC

NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.)

Nathan E. Doss

TELEPHONE NUMBER (include area code)

(773) 995-7900 ext. 102

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 11528 S. Halsted | Chicago, IL 60628 | 09 / 07 / 1979<br>M   D   YEAR |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

NAME OF RESPONDENT

Kenco Logistic Services, LLC

| | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE NUMBER (include area code) |
|---|---|---|
| | 15+ | (815) 468-9999 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1125 W. Sycamore | Manteno, IL 60950 | Kankakee |

CAUSE OF DISCRIMINATION BASED ON:

Race    Sex    Retaliation    Coercion    Conspiracy

DATE OF DISCRIMINATION
EARLIEST (ADEA/EPA)  LATEST (ALL)

March 29, 2015

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:    ☒ CONTINUING ACTION

## S E E   A T T A C H E D

so want this charge filed with the EEOC. I will advise the ncies if I change my address or telephone number and I will perate fully with them in the processing of my charge in ordance with their procedures.

EEO-5 FORM (Rev. 1/12-INT)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974: See Privacy Act Statement before completing this form.

\# 15W0407.05

| AGENCY | CHARGE NUMBER |
|---|---|
| ☒ IDHR | 2015CF2725 |
| ☐ EEOC | |

## Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINT (indicate Mr. Ms. Mrs.) | TELEPHONE NUMBER (include area code) |
|---|---|
| Nathan E Doss | 773 995 7900 Ext 102 |

| STREET ADDRESS | CITY, STATE, ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 11528 S. Halsted | Chicago IL 60628 | 09.07.79 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE, LIST BELOW)

| NAME OF RESPONDENT | NUMBER OF EMPLOYEES, MEMBERS +15 | TELEPHONE NUMBER (include area code) |
|---|---|---|
| Mas-llanco logistics | +3000 | 815 468 9999 |

| STREET ADDRESS | CITY, STATE, ZIP CODE | COUNTY |
|---|---|---|
| 1125 W Sycamore | Manteno, IL 60950 | Knikakes |

| CAUSE OF DISCRIMINATION BASED ON: | DATE OF DISCRIMINATION EARLIEST (ADEA/EPA) LATEST (ALL) |
|---|---|
| Race, Sex, Retaliation, Coercion, Conspiracy | 3/29/15 |
| | ☒ CONTINUING ACTION |

S E E   A T T A C H E D

Dept. of Human Rights
SWITCHBOARD

APR 07 2015

RECEIVED

By: Pa

ge 1 of

also want this charge filed with the EEOC. I will advise the agencies if change my address or telephone number and I will cooperate fully with hem in the processing of my charge in accordance with their procedures.

SUBSCRIBED AND SWORN TO BEFORE ME

THIS 4th DAY OF April, 2015

NOTARY SIGNATURE

OFFICIAL SEAL
CASSANDRA HOLT
Notary Public - State of Illinois
My Commission Expires Jun 17, 2018

NOTARY STAMP

X _____ 4.4.15
SIGNATURE OF COMPLAINANT    DATE

I declare under penalty that the foregoing is true and correct I swear or affirm that I have read the above charge and that is is true to the best of my knowledge, information and belief

5 FORM (Rev. 05/14-INT)

STATE OF ILLINOIS
ILLINOIS DEPARTMENT OF HUMAN RIGHTS

**CHICAGO OFFICE**
DEPARTMENT OF HUMAN RIGHTS
100 W RANDOLPH ST., SUITE 10-100
CHICAGO, ILLINOIS 60601
(312) 814-6200
(866) 740-3953 (TTY)

**SPRINGFIELD OFFICE**
DEPARTMENT OF HUMAN RIGHTS
222 S. COLLEGE ST., ROOM 101
SPRINGFIELD, ILLINOIS, 62704
(217) 785-5100
(866) 740-3953 (TTY)

Dept. of Human Rights
SWITCHBOARD

APR 0 7 2015

RECEIVED

CHARGE NO: _____

**CHARGE OF DISCRIMINIATION**

By: _____

**COMPLAINANT**

Name *Nathan E. Doss C/o attorney Jordan T. Hoffman*
Address *11528 S. Halsted*
City, State ZIP *Chicago IL 60628*
Telephone Number *773 9917800 Ext 102*

I believe that I have been personally aggrieved by a civil rights violation committed on

(date/s of harm): *OctobER 10, 2014 to date*, by: *Kim VarVel, Melissa Hansen, Tammi*
*fowler, Dan Dey, David Jabaley*
*Mario lopez*

**RESPONDENT**

Name *MARS-KenEo*
Address *1125 W Sycamore Rd*
County *Kankakee*
City, State ZIP *Manteno, IL 60950*
Telephone Number *815 488 9999*

**SEE ATTACHED**

I, *Nathan Doss* _____ on oath or affirmation state that I am Complainant herein,
that I have read the foregoing charge and know the contents thereof, and that the same is true and
correct to the best of my knowledge.

_____ *4-4-15*
Complainant's Signature and Date

Subscribed and Sworn to

Before me this *4TH* day

of *APRIL*, *2015*

_____
Notary Public Signature

OFFICIAL SEAL
CASSANDRA HOLT
Notary Public - State of Illinois
My Commission Expires Jun 17, 2018

_____
Notary Stamp

IDHR Form #6
Rev. 05/14

## Issue/Basis

Race-Black (Comparable-Tina Harris)
Retaliation

## Unequal Terms and Conditions of Employment, Retaliation, Discrimination and Harassment

### Prima Fascia Allegation

a.  Mars-Kenco logistics lost its contractual agreement with Mars, Inc. on or about January 21, 2015 and was subject to the WARN ACT.  Kenco violated the WARN Act by not notifying me of the mass lay off.

b.  On or about the February 2, 2015, Mars-Kenco logistics failed to notify me at all of the process and protocol to secure employment with the new company, as it had with the other employees who were not on FMLA.

c.  Mars-Kenco Logistics failed to engage in the protect class activities under the Family Medical Leave Act and Americans with Disability Act.

d.  When I had returned to work, I was notified that I had missed my interview with the Excel the new management company and that I was too had been informed of such by Kenco.

e.  When I returned to work I was reassigned to different job duties and tasks, as well as, being denied access to the office, email and other fringe benefits associated with being a lead.

f.  When I finally did secure an interview and offer was made, but it was retracted because the only job I could have interviewed for was a lead and they could not offer me another job because I missed my interview.

a.  Similarly situated non-disabled employees were not treated in this manner

Nathan E. Doss —Mars/Kenco Logistics

1

b. The harassment, unequal terms and conditions, retaliation, and discrimination followed the complaint to the IDHR, corporate and HR within such a period of time as to raise an inference of retaliatory motivation.

## Issue/Basis

**Race-Black** (Comparable-Tina Harris, Valerie Lillie and Lori Varvel)
**Retaliation**

## Failure to Comply with FMLA

**Prima Fascia Allegation**

a. Mars-Kenco Logistics failed to engage in the protect class activities under the Family Medical Leave Act.

b. On or about the February 2, 2015, Mars-Kenco logistics failed to notify me at all of the process and protocol to secure employment with the new company, as it had with the other employees who were not on FMLA.

## Issue/Basis

**Race-Black** (Comparable-Tina Harris and Valerie Lillie)
**Retaliation**

## Failure to Comply with ADA Regulations

**Prima Fascia Allegation**

a. Mars-Kenco Logistics failed to engage in the protect class activities under the Americans with Disability Act.

b. On or about the February 2, 2015, Mars-Kenco logistics failed to notify me at all of the process and protocol to secure employment with the new company, as it had with the other employees who are deemed disabled.

## Issue/Basis

*Nathan E. Doss — Mars/Kenco Logistics*                                                                    2

Race-Black (Comparable-Valerie Lillie and Tina Harris)
Retaliation

## Willful Interference

Prima Fascia Allegation

a. Mars-Kenco intentionally and willfully interfered with benefits, terms and conditions of the WARN ACT (820 ILCS 65) by not notifying me of the mass lay off to meet the required 60 timeframe.

b. Mars-Kenco intentionally and willfully interfered with my business relationships and opportunities when they failed to notify me at all of the process and protocol to secure employment with the new company, as it had with the other employees who were not on FMLA.

c. Mars-Kenco Logistics intentionally and willfully interfered when they failed to engage in the protect class activities under the Family Medical Leave Act and Americans with Disability Act.

d. Since late September 2014-to date, Lori Varvel, Melissa Hansen, Tammi Fowler, Dan Dey, David Jabaly, and Mario Lopez willfully interfered with the violation of my constitutional rights to oppose disparate and disparaging treatment, not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being free from being treated differently because of a hostile work environment, a disability, harassment, nepotism, favoritism, racism, being subjugated to harsher and more strenuous work assignments, less pay and less hours afforded to be worked

e. Intentional and willful interference of job duties and obligations as lead in the opposition of disparate and disparaging treatment and impact of employees, especially African American's

f. Intentional and willful interference and obstruction of justice to avoid culpability for the actions of Mars-Kenco and its agents in the creation and sustainment of a racially charged, motivated and animus atmosphere that fosters hate crimes, threats, disparate and disparaging impact and treatment to those who oppose such treatment .

g. Intentionally, willfully and woefully failing to investigate documented claims of racially charged and motivated instances and hate crimes by myself and others.

Nathan E. Doss –Mars/Kenco Logistics

3

h. Intentional and willful interference of the obligations to mitigate and uphold opposition to the impeding and obstruction of justice to governmental regulatory agencies, such as but not limited to the Department of Human Rights.

## Issue/Basis

Race-Black (Comparable-Stephanie Dumas)
Sex-Male
Retaliation

## Conspiracy

### Prima Fascia Allegation

a. On or about May-to date, Kelvin Walsh, David Jabaley, Tammi Fowler, Dan Dey, Mario Lopez, Mike Manzello, Paula Hise, and Kenco Corporate willfully conspired against the violation of my constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being the same as similar situated whites performing the job duties and descriptions of a lead.

b. On or about late September 2014-to date, David Jabaly, Melissa Hansen, Mario Lopez, Tammi Fowler, and Lori Varvel willfully conspired against the violation of my constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being free from a hostile work environment, harassment, nepotism, favoritism, racism, retaliation, being subjugated to harsher and more strenuous work assignments, less opportunities, and less hours afforded to be worked.

c. On or about November 10, 2014 Mario Lopez, Melissa Hansen, Dustin, and Russell willfully conspired against the violation of my constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being free from a hostile work environment, harassment, nepotism, favoritism, racism, retaliation, being subjugated to harsher scrutiny and more strenuous work assignments by contriving that I had failed to execute the proper procedure and protocol for interleaving despite the supervisor having full knowledge of the plan, as well as, being told that I did not like following directions, when in fact no directions were given.

d. On or about November 16, 2014, Mario Lopez and Melissa Hansen willfully and intentionally conspired against my constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being free from a hostile work environment, harassment, humiliation, nepotism, favoritism, racism, retaliation, being subjugated to harsher scrutiny and more strenuous work assignments by having Stacey Bushey and Russ Shippets give me a reprimand of a verbal/written Opportunity for Improvement verbal/write up in the break room in front of other employees.

e. On or about November 16, 2014, Russell Shippets willfully and intentionally conspired against my constitutional rights to oppose disparate and disparaging treatment, as well as, to not be treated differently, disparagingly, or biasly regarding my fundamental protected rights of being free from a hostile work environment, harassment, humiliation, nepotism, favoritism, racism, retaliation, being subjugated to harsher scrutiny and more strenuous work assignments by physically intimidating and coercing me to sign the verbal/written (reprimand) Opportunity for Improvement Form that stated through "Carelessness or inefficient performance of job duties, including the failure to maintain proper standards of performance or interfering with the work of other employees."

## Issue/Basis

Race-Black (Comparable-Stephanie Dumas)
Sex-Male
Retaliation

## Coercion

### Prima Fascia Allegation

a. Beginning on or about December 2013 to November 16, 2014, on an ongoing and regular basis coercion occurred when Kelvin Walsh forced me to take a position paying less money than the white counterparts in order to obtain the position. After complaining of such, I was coerced into taking a supposed reasonable suspicion drug test by Valerie Lillie and Mike Manezello because I supposed smelled like "weed." The protocol followed really turned out to be a drug and alcohol test for an on the job accident and I was told that if I refused I would be terminated, even though it was my day off. I was also coerced into using my PTO time to make up for being afforded less hours to work than my white counterparts, after complaining about the shift I was to run on the weekend

kept getting cancelled without proper notice. I was coerced by David Jabaley and Tammi Fowler into signing an Opportunity for Improvement Form as a condition of returning to work after an unlawful suspension and without being apprised of the protocol for the investigation and the outcome thereof; whereby I was allegedly insubordinate, despite my supervisor stating that was not the case. I was coerced and physically intimidated by Russell Shippets to sign another contrived Opportunity for Improvement form because of alleged Carelessness or inefficient performance of job duties, including the failure to maintain proper standards of performance or interfering with the work of other employees." When in fact this information had not been communicated to me or my supervisor.

I was also intimidated and coerced into being continually subjugated to the disparate and disparaging treatment and impact of a racially animus and charged environment because no one would ever investigate my claims, evade and obstruct justice, follow company policy, protocol or procedure, as well as, follow any federal mandates or guidelines; while constantly placing me in a posture of fear for the loss of my job and the well-being of my family. Matter of fact the Vice President, Paula Hise, of the Division lauded, condoned and called a ring leader and initiator of these acts a valued employee, a great asset and friend of the company, when he was transitioning out.

Nathan E. Doss –Mars/Kenco Logistics

6

# FILING SUIT IN COURT OF COMPETENT JURISDICTION

**PRIVATE SUIT RIGHTS**

The issuance of this *Notice of Right to Sue* or *Dismissal and Notice of Rights* ends the EEOC process with respect to your Charge. You may file a lawsuit against the Respondent within 90 days from the date you receive this Notice. Therefore, you should keep a record of the date. Once the 90 day period is over, your right to sue is lost. If you intend to consult an attorney, you should do so as soon as possible. Furthermore, in order to avoid any question that you did not act in a timely manner, if you intend to sue on your own behalf; your suit should be filed well in advance of the expiration of the 90 day period.

You may file your lawsuit in a court of competent jurisdiction. Filing this Notice is not sufficient. A court complaint must contain a short Statement of the facts of your case which shows that you are entitled to relief. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the Respondent has its main office.

You may contact the EEOC if you have any questions about your rights, including advice on which court can hear your case, or if you need to inspect and copy information contained in the case file.

**IF THE FIRST THREE CHARACTERS OF YOUR EEOC CHARGE NUMBER ARE "21B" AND YOUR CHARGE WAS INVESTIGATED BY THE ILLINOIS DEPARTMENT OF HUMAN RIGHTS (IDHR), REQUEST FOR REVIEWING AND COPYING DOCUMENTS FROM YOUR FILE MUST BE DIRECTED TO IDHR.**

A lawsuit against a private employer is generally filed in the U.S. District Court.

A lawsuit under Title VII of the Civil Rights Act of 1964, as amended, against a State agency or a political subdivision of the State is also generally filed in the U.S. District Court.

However, a lawsuit under the Age Discrimination in Employment of the American with Disabilities Act or, probably, the Equal Pay Act against a State instrumentality (an agency directly funded and controlled by the State) can only be filed in a State court.

A lawsuit under the Age Discrimination in Employment Act or the American with Disabilities Act or the Equal Pay Act against a political subdivision of a State, such as municipalities and counties, may be filed in the U.S. District Court.

For a list of the U.S. District Courts, please see the reverse side.

**ATTORNEY REPRESENTATION**

If you cannot afford an attorney, or have been unable to obtain an attorney to represent you, the court having jurisdiction in your case may assist you in obtaining a lawyer. If you plan to ask the court to help you obtain a lawyer, you must make this request of the court in the form and manner it requires. Your request to the court should be made well in advance of the 90 day period mentioned above. A request for representation does not relieve you of the obligation to file a lawsuit within the 90-day period.

**DESTRUCTION OF FILE**

If you file suit, you or your attorney should forward a copy of your court complaint to this office. Your file will then be preserved. Unless you have notified us that you have filed suit, your Charge file could be destroyed as early as six months after the date of the Notice of Right to Sue.

IF YOU FILE SUIT, YOU OR YOUR ATTORNEY SHOULD NOTIFY THIS OFFICE WHEN THE LAWSUIT IS RESOLVED.